Kelsey **BOWMAN**, minor b/n/f John **BOWMAN** and Karrie Bowman, Appellants–Plaintiffs,

v.

Alycea **McNARY**, Tippecanoe School Corporation, Tippecanoe School Corporation Board of Trustees, Brad Wagner and The Ade Group, Inc., Appellees–Defendants.

No. 79A04–0511–CV–684.

Court of Appeals of Indiana.

Aug. 31, 2006.

Brian W. Walker, Cheryl M. Knodle, Ball Eggleston, PC, Lafayette, Indiana, Attorney for Appellants.

Thomas J. Trauring, Kokomo, Indiana, Attorney for Appellee, Alycea McNary.

Rich McDermott, Law Offices of the Liberty Mutual Group, Carmel, Indiana, Attorney for Appellee, Tippecanoe School Corporation and Tippecanoe School Corporation Board of Trustees.

## OPINION

BARNES, Judge.

### Case Summary

Kelsey Bowman, by her parents Jon and Karrie Bowman, appeals the trial court's grant of summary judgment in favor of the Tippecanoe School Corporation, the Tippecanoe School Corporation Board of Trustees (collectively "the School Corporation"), and Alycea McNary. We affirm.

### Issues

The issues before us are:

I. whether Bowman may proceed with a cause of action for negligence against McNary after McNary unintentionally struck Bowman with a golf club on a driving range;

II. whether Bowman may proceed with a cause of action for reckless-ness against McNary based on the same conduct; and

III. whether Bowman is barred by the doctrine of incurred risk from proceeding with a negligence action against the School Corporation.

### Facts

The designated evidence most favorable to Bowman, the non-movant, reveals that Bowman and McNary were teammates on the McCutcheon High School girls' golf team. On August 13, 2003, the team was practicing at the Ravines Golf Course in Lafayette. After playing a few holes, Coach Brad Wagner directed the team to the driving range and told the girls to "get loosened up" while someone else retrieved balls for the girls to hit. App. p. 22B–15. Bowman, McNary, and a third teammate, Allison Lancaster, were standing together in the driving range area, which was marked off by a rope, and talking while holding their golf clubs and stretching. Lancaster stepped away and began taking practice swings. McNary also took a practice swing, apparently without first stepping away. Bowman, who was standing to the side of or behind McNary, was struck in the head by McNary's club. The blow left Bowman blind in one eye. It is undisputed that McNary did not intentionally strike Bowman.

Bowman, by her parents, filed suit against McNary, Wagner, the School Corporation, and the owner of the golf course. The complaint alleged that McNary's negligence was a cause of Bowman's injury; it also alleged the School Corporation had failed to properly supervise the girls' golf team and ensure its members' safety. Bowman subsequently settled with the golf course owner, and Wagner was dismissed as a party in the case. McNary and the School Corporation filed separate motions for summary judgment. In response to

McNary's motion, Bowman contended for the first time that McNary had been not only negligent, but reckless when she struck Bowman. The trial court granted both motions for summary judgment, and Bowman now appeals.

### Analysis

Summary judgment is appropriate only if the evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C); *Cox v. Stoughton Trailers, Inc.*, 837 N.E.2d 1075, 1079 (Ind.Ct.App.2005). We must construe all facts and reasonable inferences drawn from those facts in favor of the nonmoving party. *Cox*, 837 N.E.2d at 1079. Our review of a summary judgment motion is limited to those materials designated to the trial court, and we must carefully review decisions on such motions to ensure that parties are not improperly denied their day in court. *Id.* "All trial court rulings should be presumed to be correct, but in the context of summary judgment proceedings we will not hesitate to reverse a trial court's ruling if it has misconstrued or misapplied the law, failed to consider material factual disputes, or improperly considered immaterial factual disputes." *Beta Steel v. Rust*, 830 N.E.2d 62, 68 (Ind. Ct.App.2005).

### I. Negligence—McNary

█ Bowman contends the trial court erred in concluding as a matter of law that she was barred from proceeding with a claim of negligence against McNary. This court on several occasions has addressed the viability of negligence actions arising in the context of sports. The general rule from those cases is, "voluntary participants in sports activities ... cannot recover for injury unless it can be established that the other participant either intentionally caused injury or engaged in conduct so reckless as to be totally outside the range of ordinary activity involved in the sport." *Mark v. Moser*, 746 N.E.2d 410, 420 (Ind. Ct.App.2001). Stated slightly differently, "as a matter of law, participants in sporting events will not be permitted to recover against their co-participants for injuries sustained as the result of the inherent or foreseeable dangers of the sport." *Id.* at 421. We have also held, "it is a question of law for the determination of the court, whether the injury-causing event was an inherent or reasonably foreseeable part of the game...." *Id.* at 420.

We acknowledge that our rationale for the rule originally stated in *Mark* has not been constant. In *Mark*, we reached this holding by relying on the doctrine of assumption of risk, specifically "primary" assumption of risk. *See id.* at 418–20. We observed that "[s]econdary assumption of risk is applied according to a subjective standard" based on a plaintiff's actual knowledge and appreciation of a particular risk. *Id.* at 418. Primary assumption of risk, on the other hand, "is applied according to an objective, rather than subjective, standard." *Id.* We stated that "New York and California recognize primary assumption of risk as having survived enactment of their comparative negligence statutes" and "have retained assumption of risk in the sports injury context by recasting it as a no-duty rule." *Id.* (citing *Knight v. Jewett*, 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696 (1992), and *Turcotte v. Fell*, 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964 (1986)). Ultimately, we concluded by adopting "an objective primary assumption-of-risk doctrine and a standard of care greater than negligence" in the context of sports injuries caused by co-participants in sports activities. *Id.* at 420. "The plaintiff's assumption of risk is primary in nature inasmuch as it flows from the legal relationship of the parties, is evaluated according to an objective standard rather

than a subjective standard, and acts to bar recovery." *Id.*

We next addressed sports injuries caused by co-participants in *Gyuriak v. Millice,* 775 N.E.2d 391 (Ind.Ct.App.2002), *trans. denied.* The plaintiff in that case asked the panel to disagree with *Mark* because it allegedly was inconsistent with the Indiana Comparative Fault Act ("the Act"), Indiana Code Sections 34–51–2–1 to 19, because the doctrine of assumed risk had been subsumed by the Act. *See id.* at 394. The majority in *Gyuriak* rejected this argument, concluding:

> The kind of incurred or assumed risk that has been subsumed by [the Act] is thus necessarily the secondary, and not the primary, kind, because the concept of primary assumed risk essentially addresses the existence of a legal duty and not the nature of the parties' conduct, and is therefore unrelated to the question of "fault." Thus, the holding in *Mark,* which is essentially that a participant in a sporting activity assumes the risk of dangers inherent in the activity such that the participant is owed no legal duty with regard to those inherent risks, does not conflict with [the Act].

*Id.* at 395.

Judge Robb dissented in *Gyuriak,* arguing that both the majority opinion and Mark were incorrect. She noted that in 1995, our supreme court decided *Heck v. Robey,* 659 N.E.2d 498 (Ind.1995). In *Heck,* the court addressed whether a paramedic could be barred from bringing a negligence action against a person he had treated based on the doctrine of incurred risk or assumption of risk.[1] The court said no, stating in part:

> [T]he complete defense of "incurred risk" no longer exists; it is subsumed by

the concept of fault in our comparative fault scheme. As a component of fault, it is subject to the Act's apportionment scheme that reduces or eliminates the plaintiff's recovery depending on the degree of the plaintiff's fault. Any rule that purports to effect an absolute defense based upon incurred risk is contrary to our comparative fault scheme.

\* \* \* \* \*

> In other jurisdictions primary assumption of risk may be either express or implied. We reject this primary assumption-of-risk terminology to the extent that it suggests that a lack of duty may stem from a plaintiff's incurred risk. Under the Act, a plaintiff may relieve a defendant of what would otherwise be his or her duty to the plaintiff only by an express consent.

*Id.* at 504–05 (footnotes and citations omitted). Judge Robb maintained that *Mark's* reliance on "primary assumption of risk" directly conflicted with *Heck. Gyuriak,* 775 N.E.2d at 398–99 (Robb, J., dissenting). The majority responded to this contention by positing that *Heck* did not represent our supreme court's current position regarding primary assumption of risk because of a subsequent decision, *Creasy v. Rusk,* 730 N.E.2d 659 (Ind.2000). *See Gyuriak,* 775 N.E.2d at 395 n. 2.

Our next discussion regarding this issue was *Geiersbach v. Frieje,* 807 N.E.2d 114 (Ind.Ct.App.2004), *trans. denied.* Judge Robb, now writing for a unanimous panel, re-affirmed the basic holdings of both *Mark* and *Gyuriak,* stating, "any participant in a sporting event or practice may not recover from any other participant without proving that the injury was caused by malicious or reckless behavior or that the injury was intentional." *Id.* at 121.

---

1. The majority in *Gyuriak* observed that the terms "assumption of risk" and "incurred risk" essentially are interchangeable. *Gyuriak,* 775 N.E.2d at 394 n. 1.

The *Geiersbach* opinion states, however, that the language used in *Mark* and *Gyuriak* was "misleading" and concludes, "We believe that the confusion caused by the 'incurred risk' and 'assumption of risk' language can be assuaged by merely stating that athletes who choose to participate in sports must accept that those sports involve a certain amount of inherent danger." *Id.* at 120.

■ Today, we refine *Geiersbach*, and clarify our position and reasoning regarding co-participants in sporting activities. We state explicitly what was implied in *Mark, Gyuriak,* and *Geiersbach:* in accordance with traditional negligence principles, there is no duty from one participant in a sports activity to another to prevent injury resulting from an inherent risk of the sport.

■ The tort of negligence has three elements: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff resulting from the defendant's breach. *Rhodes v. Wright,* 805 N.E.2d 382, 385 (Ind.2004). Generally, whether a duty exists is a question of law for the court to decide, although sometimes the existence of a duty depends upon underlying facts that require resolution by a trier of fact. *Id.* at 386. "Absent a duty, there can be no breach and, therefore, no recovery in negligence." *Williams v. Cingular Wireless,* 809 N.E.2d 473, 476 (Ind.Ct.App.2004), *trans. denied.*

In *Heck,* our supreme court, although concluding that "incurred" or "assumed" risk could no longer be an absolute defense to a negligence action, also observed, "The court may determine on other grounds that no duty exists based upon '(1) the relationship between the parties, (2) the reasonable foreseeability of harm to the

person injured, and (3) public policy.'" *Heck,* 659 N.E.2d at 505 n. 11 (quoting *Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind. 1991)). In *Creasy,* the court resolved the case before it in reliance on the *Webb* three-part duty test. *See Creasy,* 730 N.E.2d at 667. We also assess this case by applying the *Webb* test. This approach does not conflict with *Heck* according to the *Creasy* majority. We also believe that there are no genuinely disputed material facts related to the question of whether McNary owed Bowman a duty of care, making this a pure question of law.

■ The first consideration in determining whether McNary owed Bowman a duty in this case is the relationship of the parties. "In determining whether a relationship exists that would impose a duty, we must consider the nature of the relationship, a party's knowledge, and the circumstances surrounding the relationship." *Downs v. Panhandle Eastern Pipeline Co.,* 694 N.E.2d 1198, 1203 (Ind.Ct.App.1998), *trans. denied.* A duty of reasonable care is not owed to the world at large, but must arise out of a relationship between the parties. *Williams,* 809 N.E.2d at 476. The very nature of McNary and Bowman's relationship and the circumstances surrounding it suggest that it was based on their common participation in a sport that, while not as dangerous as many, still involved certain inherent risks, such as being struck unintentionally by either a golf ball or club while on a course or practice tee. That Bowman was aware of such risks is evidenced by her own deposition testimony and the release of liability form she and her mother signed before joining the golf team, which stated in part, "I know the risks involved in athletic participation...." App. at p. 22B–16.[2]

2. This form only directly applied as to the School Corporation, not McNary.

■ With respect to the foreseeability component of the duty analysis, we admit that negligent conduct during a sporting event or practice carries a substantial risk of injury to a co-participant. This was one of the reasons we decided *Mark, Gyuriak,* and *Geiersbach* the way we did, i.e. the risk of injury is inherent to some degree in all athletic activities and ought to be apparent to both injured and injuring parties. Consistent with *Heck,* however, a plaintiff's foreknowledge of risk is not a complete defense pursuant to the Act and is not determinative of whether the defendant owed the plaintiff a duty. *See Smith v. Baxter,* 796 N.E.2d 242, 244 (Ind.2003).

■ This leads us to the final duty consideration, public policy. " 'Duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of public policy which lead the law to say that the plaintiff is entitled to protection.' " *Williams,* 809 N.E.2d at 478 (quoting *Webb,* 575 N.E.2d at 997). Various factors affect this policy consideration, including convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, and the moral blame attached to the wrongdoer. *Id.* Simply because an action may have some degree of foreseeable consequences does not make it sound public policy to impose a duty on the actor vis-à-vis an injured party. *Id.*

Although we explicitly relied upon the doctrine of assumption of risk in *Mark,* we nevertheless explained in detail why it would be poor public policy to allow claims of negligence to proceed in cases involving co-participants in a sporting activity and an injury that was an inherent risk of the sport. We conclude that these statements apply with equal force within a *Webb* duty analysis, and we quote them at length:

In determining the appropriate standard of care between co-participants in sporting activities in Indiana, we are mindful that in Indiana, as in the rest of the United States, participation in recreational sports has become an increasingly popular leisure time activity. Indeed, over the last decade, more Americans than ever before "have joined recreational softball, basketball, football [and] other types of sports leagues," and there has also been a dramatic increase in participation in high school and college organized sports. Our legislature also emphasized and endorsed the growing importance of sporting and recreational activities in Indiana, when it enacted a statute specifically immunizing landowners from liability if they have opened their property for recreational use. *See* Ind.Code § 14–22–10–2.

After reviewing the decisions of other jurisdictions that have considered this issue, we are convinced that a negligence standard would be over-inclusive. Specifically, we believe that adopting a negligence standard would create the potential for mass litigation and may deter participation in sports because of fear of incurring liability for the injuries and mishaps incident to the particular activity. Further, we believe that the duty of care between co-participants in sports activities is sufficiently distinguishable from Indiana cases where a student athlete sues an educational institution or its representatives, to merit a heightened standard of care. Specifically, application of a negligence standard is justified where a student athlete sues a school or its representatives because there is a well-established duty on the part of such institutions and their personnel to exercise ordinary and reasonable care for the safety of those under their authority. However, no such analogous authority or responsibility exists between co-participants in sporting

events, and therefore, we are not compelled to adopt a similar standard in this context.

\* \* \* \* \*

We are affording enhanced protection against liability to co-participants in sports events, in part, because we recognize that they are not in a position, practically speaking, to protect themselves from claims. Event organizers, sponsors, and the like, are able to safeguard themselves from liability by securing waivers. They usually accomplish this by requiring each participant to sign a waiver and assumption-of-risk form as a condition of competing in the event. However, in most instances, it is simply infeasible for participants to protect themselves by similar means. Indeed, at large sporting events, participants would have to exchange many releases in order to avoid liability.

*Mark*, 746 N.E.2d at 419–21 (citations and footnotes omitted). We would add that sports, including golf, have their own specific rules, some of which are designed to enhance the safety of the participants. Adoption of and instruction in such rules provides a means of self-regulation regarding prevention of injuries in the context of sports. Courts ought not intervene in such self-regulation except where reckless or intentional misconduct is concerned.

In considering these public policy considerations against the factors of the relationship of the parties and foreseeability, we observe, "Courts will generally find a duty where reasonable persons would recognize and agree that it exists." *In Re Estate of Heck ex rel. Heck v. Stoffer*, 786 N.E.2d 265, 268 (Ind.2003). We are the fourth panel of this court to address this particular question, and although our reasoning has varied in each case, all four panels have come to the conclusion that liability should not attach for negligence in situations involving co-participants in an organized sporting activity and an injury that was an inherent risk of the sport.[3] As we observed in *Mark*, many other jurisdictions have reached the same conclusion. *Mark*, 746 N.E.2d at 416–19. We have on four occasions reached the conclusion, implicit and explicit, that no duty attaches in this situation.

We also decline, as we did in *Gyuriak*, to limit this rule to "contact" sports only. *See Gyuriak*, 775 N.E.2d at 395. Most sports, even "non-contact" ones, carry the risk of unintentional contact with a co-participant.[4] Additionally, the rule applies to injuries sustained by any co-participants in a sporting activity, which would include teammates injured during a practice. *See Geiersbach*, 807 N.E.2d at 120. Thus, under the *Webb* duty formulation, McNary owed no duty to Bowman to exercise reasonable care to prevent the injury Bowman sustained if they were co-participants in an organized sporting activity and the injury was of a type that is inherent to golf.

Although we do not follow *Mark's* reliance on primary assumption of risk, we conclude that it is correct and consistent

---

3. We recently held that the logic of *Mark*, *Gyuriak*, and *Geiersbach* should apply only to "*organized* sporting and recreational activities...." *See Davis v. LeCuyer*, 849 N.E.2d 750, 756 (Ind.Ct.App.2006), *trans. pending.*

4. Some medical researchers have noted an increase in golf-related head injuries in recent years, particularly in children under age nineteen, as participation in the sport has increased, with those injuries being caused by mis-swung clubs, errant balls, and golf cart accidents. *See* Medical College of Georgia, "Golf–Related Head Injuries in Children Increasing Along with Sport's Popularity," http://www.mcg.edu/news/2005News-Rel/Golf.html (last updated April 4, 2005).

with *Webb* to evaluate, under an objective standard and as a question of law for courts to decide, "whether the injury-causing event was an inherent or reasonably foreseeable part of the game...." *Mark,* 746 N.E.2d at 420. We believe that anyone who has ever participated in or watched a golfing event knows that golfers, almost as a matter of habit, routinely take practice swings while on the course or a practice tee, regardless of whether they are actually preparing to hit a ball. McNary and Bowman both were standing within the practice tee area of a driving range, which was demarcated with a rope. Being unintentionally struck with a golf club while standing in a marked-off driving range area is an inherent risk of the game of golf.

This case directly contrasts with one relied upon by Bowman, *Phares v. Carr,* 122 Ind.App. 597, 106 N.E.2d 242 (1952). In that case, the plaintiff was injured when she was struck by a golf club swung near, but not on, a driving range. The incident took place while the plaintiff was walking from the parking lot to the designated practice tee area. Relying on the assumption of risk doctrine, the defendant driving range owner contended he was not liable "for damages sustained by participants or spectators by reason of injuries which are reasonably incidental to the particular athletic events." *Id.* at 602, 106 N.E.2d at 244. We rejected this argument, noting the injury occurred as the result of negligence that occurred "*outside the area* provided for active participation of the sport." *Id.* Here, however, both McNary and Bowman were within the demarcated practice tee area for the driving range when the alleged negligence occurred. *Phares* is readily distinguishable.

Bowman also contends that no "sporting activity" was occurring at the time of the incident because she, McNary, and Lancaster supposedly were taking a break while awaiting the delivery of balls to hit off the practice tees. It is clear, however, that the young women had been directed to the driving range by their coach to continue their practice and had arrived at that location when the incident occurred. The coach had also told them to get "loosened up," which it is apparent to us could include taking practice swings. App. p. 22B–15. This was not an incident completely unrelated to the practice session, and it took place in an area designated for swinging golf clubs. We also believe the facts of this case differ significantly from *Davis v. LeCuyer,* in which we held that a negligence standard of liability should apply with respect to a recreational jet skiing accident. *See Davis,* 849 N.E.2d at 756. We conclude the incident occurred between co-participants in an organized "sporting activity," even though it might have been an informal moment during the practice session.

Bowman also argues that the incident was not an inherent risk of golf because McNary's swing was unexpected and constituted a violation of the rules of golf. This, however, is tantamount to saying that McNary's allegedly negligent conduct was unexpected. Most injured parties do not expect the specific negligent act that injures them, although such acts may be potentially and generally foreseeable. Additionally, as we stated in *Mark,* "while some injuries may result from rules violations, we believe such violations are nonetheless an accepted part of any competition and among the anticipated risks of participation in the game." *Mark,* 746 N.E.2d at 420. Although McNary's errant swing was not, strictly speaking, part of a "competition," this observation applies here nonetheless.

In sum, we conclude as a matter of law that McNary owed Bowman no duty to

prevent the type of injury Bowman sustained, which was an inherent risk of the game of golf. The trial court correctly determined that Bowman cannot maintain a negligence action against McNary based on the facts of this case.

### II. Recklessness—McNary

Bowman also contends that even if she cannot press a negligence claim against McNary, there is a material issue of fact as to whether McNary's conduct rose to the level of recklessness.[5] In *Mark*, we referred to the definition of "recklessness" found in the Second Restatement of Torts:

> A player will be considered to have acted in reckless disregard of the safety of another player if "he does an act, or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable person to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."

*Mark*, 746 N.E.2d at 422 (quoting Restatement (Second) of Torts § 500 (1965)). We also stated that precluding liability for negligent conduct but allowing recovery for reckless or more serious conduct in the context of sporting activities "will avoid judicial review of the kind of risk-laden conduct that is inherent in sports and generally considered to be part of the game, while at the same time imposing liability for acts that are clearly unreasonable and beyond the realm of fair play." *Id.* Additionally, the conduct must be so reckless as to be totally outside the range of ordinary activity involved in the sport. *Geiersbach*, 807 N.E.2d at 119.

In *Mark*, we did not address directly whether there was evidence of reckless conduct on the defendant's part. Here, we must do so. We conclude it is necessary to more closely assess the Second Restatement's definition of "recklessness." In doing so, we are of the opinion that that definition, and in particular its reference to the defendant "having reason to know of facts which would lead a reasonable person to realize" an unreasonable risk of harm, tends to needlessly blur the line between negligence and recklessness. *See Mark*, 746 N.E.2d at 422. As we have stated in a different context, the concept that a person "should have anticipated" a certain harm "is descriptive of negligence." *Bolin v. State Farm Fire and Cas. Co.*, 557 N.E.2d 1084, 1088 (Ind.Ct.App.1990), *trans. denied.* Our courts also have recognized the inherent difficulty of distinguishing between "reckless" and "negligent" conduct. *See Springer v. State*, 798 N.E.2d 431, 438 (Ind.2003). In our view the Second Restatement's definition of "recklessness" makes this task even more difficult.

Instead, we believe there is a thoroughly developed definition describing "reckless" conduct, created in a different context, that is clearer than the Second Restatement definition and more accurately embodies the underlying principles of *Mark*, *Gyuriak*, and *Geiersbach* concerning co-participants in sporting activities. Specifically, under the Indiana Guest Statute, a driver of a vehicle is immunized from liability for an accident to passengers in the

---

**5.** Bowman makes no claim that McNary intentionally injured her. We also note McNary's argument that it was improper for Bowman to claim for the first time, in response to her motion for summary judgment, that she had been reckless, where Bowman's complaint expressly and only alleged that McNary had been negligent. We need not address this argument because we conclude on the merits that the trial court correctly entered summary judgment with respect to any claim of recklessness.

driver's vehicle who are close relatives of the driver or hitchhikers, unless the driver was operating the vehicle in a "willful or wanton" manner. I.C. § 34–30–11–1. Our supreme court has accepted that " 'wanton and willful' and 'reckless' seem to imply the same disregard for the safety of others." *Obremski v. Henderson,* 497 N.E.2d 909, 911 (Ind.1986); *cf. also Clancy v. State,* 829 N.E.2d 203, 208 (Ind.Ct.App. 2005), *trans. denied* ("The general definition given to willful and/or wanton misconduct is in vital respects similar to the criminal law definition of recklessness."). One modern tort law treatise describes a "third category of fault" in between intentional and negligent misconduct "called recklessness or willful or wanton misconduct." Dan B. Dobbs, *The Law of Torts* § 27, p. 51 (2001) (emphasis added).[6]

 Given this overlap between "reckless" and "willful or wanton" misconduct, we conclude it is appropriate to incorporate the "willful or wanton" definition developed under the Guest Statute into the context of co-participants in sporting activities as the test for liability, without attempting to create infinitesimal differences between the two terms. Under the Guest Statute, "[w]anton or willful misconduct requires that the host-driver be: 1) conscious of her misconduct; 2) motivated by reckless indifference for the safety of her guest; and 3) know that her conduct subjects her guest to a probability of injury." *Duncan v. Duncan,* 764 N.E.2d 763, 767 (Ind.Ct.App.2002), *trans. denied.* A mistake or error in judgment alone is insufficient to establish wanton or willful misconduct. *Id.* Rather, the plaintiff must show that the defendant had an adverse or perverse attitude towards her guest such that

she was indifferent to the consequences of her conduct. *Id.* To allow recovery based on "willful or wanton" misconduct, the course of conduct that was the proximate cause of the injury complained of "must have been pursued with knowledge and indifference that an injury to the guest is probable." *Sidle v. Majors,* 264 Ind. 206, 225, 341 N.E.2d 763, 775 (1976), *abrogated on other grounds by Collins v. Day,* 644 N.E.2d 72, 75 (Ind.1994). "It is the conscious indifference to the consequences that renders conduct willful or wanton." *Id.*

 Translated slightly for purposes of the present case, recklessness requires that a participant in a sporting activity be (1) conscious of his or her misconduct; (2) motivated by indifference for the safety of a co-participant or co-participants; and (3) know that his or her conduct subjects a co-participant or co-participants to a probability of injury. A mistake in judgment is not sufficient to support a finding of recklessness. Rather, there must be a conscious indifference to the consequences of one's actions. This definition reflects our belief that in order to hold a co-participant liable for an injury that was an inherent risk of the sport, the defendant's conduct must be so reckless as to be totally outside the range of ordinary activity involved in the sport. *See Geiersbach,* 807 N.E.2d at 119.

 Applying this definition to the present case, and accepting Bowman's description of events as true as we must for summary judgment purposes, we believe there are no genuine issues of material fact and that as a matter of law, McNary was not acting recklessly when she struck Bowman. According to Bowman, she,

---

6. To the extent this level of culpability is often phrased as "willful *or* wanton misconduct," as it is in the Guest Statute, it suggests that either type of misconduct will suffice to impose liability. The cases describing the phrase generally do not attempt to differentiate between "willful" versus "wanton" misconduct.

McNary, and Lancaster were standing in a triangle, about arms-length apart from each other, when Lancaster took a few steps away and began taking practice swings. McNary, without stepping away, then took a practice swing and, on the backswing, struck Bowman. This necessarily means Bowman would have been standing to the side of or slightly behind McNary; in other words, Bowman would not have been in McNary's direct line of sight when she swung. There is no evidence that McNary or the others were engaged in any type of "horseplay" when she swung her club, nor that McNary swung her club brusquely in frustration or anger. There is no evidence that McNary's swing was anything other than an ordinary practice swing on a designated practice tee. Arguably, McNary made a gross error in judgment in taking her first swing of the club without first ascertaining Bowman's precise whereabouts. This, however, is not enough to establish recklessness on McNary's part because we do not believe it indicates conscious indifference to Bowman's safety. Instead, it is at most evidence of negligence, which is not actionable in this context. Put differently, McNary's swing was not totally outside the normal range of activity involved in golf.[7]

In *Mark*, we gave examples of particularly egregious conduct that would give rise to liability for injuries inflicted by one sporting co-participant on another. Biting an opponent's ear during a boxing match was one example; another was a baseball player flinging his bat toward a dugout in anger and striking another player. *See Mark*, 746 N.E.2d at 422. A current example of similarly egregious conduct would be head-butting an opposing player during a soccer match. A parallel in golf to the baseball player example we gave in *Mark* would be flinging a club in anger or swinging it wildly in frustration after hitting a poor shot and hitting another player with the club, albeit unintentionally. In other words, the mis-hit shot that injures another player on the course will not give rise to liability, but the golfer's angry and thoughtless reaction to that shot might.[8] McNary's conduct in this case does not

---

**7.** Bowman asserts that McNary acted in violation of one of the United States Golf Association's standards of etiquette, namely that "[p]layers should ensure that no one is standing close by or in a position to be hit by the club, the ball or any stones, pebbles, twigs or the like when they make a stroke or practice swing." *See* http://www.usga.org/playing/etiquette/etiquette.html (last visited July 28, 2006). As we concluded in *Mark*, "rule infractions, deliberate or otherwise, are an inevitable part of many sports, [and] a co-participant's violation of the rules of the game may be evidence of liability, but shall not per se establish reckless or intentional conduct." *Mark*, 746 N.E.2d at 420. Such is the case here.

**8.** In *Gyuriak*, we stated that the defendant would have been liable to the plaintiff if the defendant had shot his ball while the plaintiff was within range on the defendant's own fairway and had struck the plaintiff with the ball, as opposed to mis-hitting the ball and striking a player who was in the rough. *See Gyuriak*, 775 N.E.2d at 396. This statement should be understood as saying that the defendant *might* have been liable in such a situation. In other words, the defendant could have been found reckless if he intentionally took a shot while he knew the plaintiff was within range of the shot and on the fairway. For Tiger Woods, it might be fairly easy to gauge that a player is standing about 250 yards away on the fairway and that he would be likely to hit the ball off the tee with a driver at least that far. A less-experienced player would not have Woods's skill in determining the distance of a forward player or have a similar consistent driving distance—the amateur might not expect to hit the ball 250 yards, but hit a "lucky" shot nonetheless. In other words, the amateur might be negligent, but not necessarily reckless, if he or she misjudges how far ahead the forward player is on the fairway or how far his or her drive is likely to travel.

approach these examples of actionable conduct. We conclude as a matter of law that McNary's conduct was not reckless.

### III. Incurrence of Risk— School Corporation

 Bowman's final argument is that the trial court erred in concluding she cannot pursue a negligence claim against the School Corporation. Unlike co-participants in a sporting activity, there is "a duty on the part of school personnel to exercise ordinary and reasonable care for the safety of the children under their authority." *Beckett v. Clinton Prairie School Corp.*, 504 N.E.2d 552, 553 (Ind.1987). This duty extends to secondary or high schools. *See id.* at 553–54. However, the Comparative Fault Act does not apply to the School Corporation, a governmental entity. *See* Ind.Code § 34–51–2–2. As such, the holding of *Heck v. Robey*, i.e. that "incurred risk" cannot be a complete defense to a negligence action, does not apply to the School Corporation. See *Heck*, 659 N.E.2d at 504 n. 8. Thus, if Bowman as a matter of law incurred the risk of injury she sustained here, it is a complete bar to a negligence action against the School Corporation. *See Sauders v. County of Steuben*, 693 N.E.2d 16, 18 (Ind. 1998).

 Incurred risk is a conscious, deliberate, and intentional embarkation upon a course of conduct with knowledge of the circumstances. *Beckett*, 504 N.E.2d at 554 (quoting *Power v. Brodie*, 460 N.E.2d 1241, 1243 (Ind.Ct.App.1984)). It requires more than the general awareness of a potential for mishap. *Id.* "Incurred risk contemplates acceptance of a specific risk of which the plaintiff has actual knowledge." *Id.* A finding of incurred risk demands a subjective analysis focusing upon the actor's actual knowledge and voluntary acceptance of the risk. *Id.* Incurred risk, however, does not require that the actor

had precise foresight that the particular accident and injury that in fact occurred was going to occur. *See Mauller v. City of Columbus*, 552 N.E.2d 500, 503 n. 3 (Ind. Ct.App.1990), *trans. denied.*

Here, Bowman testified in her deposition in part as follows:

Q: Prior to the accident, you were aware, from your training and experience playing golf, of situations which may put you at risk for being struck with a club; is that fair?

A: Yes.

Q: It was something that you knew you needed to watch out for people when they're swinging a club, not get too close?

A: Yes.

Q: Coach Wagner didn't need to tell you that at that point; is that fair?

A: Yes.

Q: Because you already knew that?

A: Yes.

App. pp. 22C–22, 23. Bowman also described the golf course driving range:

A. It's a big area that they had two ropes for where you're to hit at because they'd alternate it where the grass was.

Q: So in that area where you would hit practice shots someone would put down two lines of ropes, correct?

A: An area to stand in.

Q: And then when you would hit practice shots would you stand between the two ropes?

A: Yes.

*Id.* at 22C–7. Bowman also testified:

Q: So the coaches never said while you're on the range you need to spread out so that you don't hit each other?

A: No.

Q: You don't recall anything like that?

A: No.

Q: But would you do that?

A: Yes.

Q: Why?

A: Because we just knew.

Q: Just knew what?

A: Not to stand right next to each other.

*Id.* at 22C–9. Bowman also testified that there was nothing to prevent anybody from taking a practice swing while standing inside the demarcated practice tee area and in front of her bag, which is what McNary had done. Finally, Bowman signed a release form that stated in part, "I voluntarily accept any and all responsibility for my own safety and welfare while participating in athletics, with full understanding of the risks involved." *Id.* at 22B–16.

Bowman was standing in the practice tee area when McNary took her swing and struck Bowman. It is apparent from Bowman's own testimony that she had actual knowledge of a risk involved in being in a driving range area, namely being struck with a golf club. Bowman voluntarily accepted that risk by choosing to be a member of the golf team and by stepping onto the driving range with others who had clubs in their hands. She seems to contend that she did not incur the risk of McNary acting negligently and taking a swing without first stepping away from her. However, if this were sufficient to defeat a finding of incurred risk in a negligence case, the defense could never be invoked. Additionally, Bowman did not have to know the specific risk that she might be struck by a club on this particular occasion; it is sufficient that she knew more generally the risk of being struck by a club while on a driving range. *See Mauller,* 552 N.E.2d at 503 n. 3. We find no genuine issues of material fact and conclude the School Corporation is entitled to judgment as a matter of law on the basis that Bowman incurred the risk of injury she sustained.

### Conclusion

The trial court properly concluded that there are no issues of material fact and that McNary and the School Corporation are entitled to judgment as a matter of law. We affirm.

Affirmed.

FRIEDLANDER, J., and MATHIAS, J., concur.