Kevin A. GRIFFIN and Maureen O. Griffin, Individually and as parents of B.G., a minor, Appellants–Plaintiffs,

v.

George E. SIMPSON and Sharon A. Simpson; Team Indiana Volleyball, Inc.; Becky Murray; Stacey Simpson; and Sally Nihill, Appellees–Defendants.

No. 18A02–1009–CT–1064.

Court of Appeals of Indiana.

April 29, 2011.

Norris Cunningham, Kathryn Elias Cordell, Hall, Render, Killian, Heath & Lyman, P.C., Indianapolis, IN, Attorneys for Appellants.

Joseph M. Dietz, Rick D. Meils, Andrew M. Sumerford, Meils Thompson Dietz & Berish, Indianapolis, IN, Attorneys for Appellees Team Indiana Volleyball, Inc. and Becky Murray.

## OPINION

CRONE, Judge.

### Case Summary

This case involves an eleven-year-old volleyball player who was injured when she was thrown from a golf cart during a six-hour break between tournament sessions. The accident occurred at the home of a teammate's grandparents, where several team members had gathered to pass the time between volleyball games.

The player, B.G., and her parents, Kevin A. and Maureen O. Griffin (collectively, "the Griffins"), filed a personal injury action against the grandparents/property owners George E. and Sharon A. Simpson ("Mr. and Mrs. Simpson"), volleyball mothers Stacey Simpson ("Stacey") and Sally Nihill, volleyball team coach Becky Murray, and Team Indiana Volleyball, Inc. ("TIV"), as Coach Murray's employer. TIV and Coach Murray filed a motion for summary judgment alleging that, as a matter of law, Coach Murray owed no duty to B.G. during the time that the team was on break between tournament sessions. The trial court agreed and granted TIV and Coach Murray's motion. The Griffins now appeal. Finding no error, we affirm.

### Facts and Procedural History

TIV is a privately owned corporation that engages in the business of competitive club volleyball. In 2006, Becky Murray was employed by TIV as coach of the eleven-to-twelve-year-old travel team. On June 3, 2006, the team had a tournament in Muncie. Early that morning, Kevin Griffin brought his daughter B.G. from Indianapolis to the tournament. The schedule for the latter part of the day depended on how the teams finished in the morning session. At the end of the morning session, Coach Murray dismissed her players to their parents and told them that they had a six-hour break before they needed to return for the evening session. Griffin had another daughter playing at the tournament and had initially planned to stay in Muncie and shuttle between his daughters' games. After the morning session, fellow team parent Stacey approached him and invited him and B.G. to an impromptu gathering at the home of her in-laws, Mr. and Mrs. Simpson. He declined the invitation and returned to Indianapolis to watch another daughter play softball. However, he sent B.G. with Stacey and Stacey's daughter. Coach Murray intended to spend her break time at the tournament venue watching matches and assisting other coaches. However, she felt tired and ill due to her pregnancy, so when team parents Stacey and Sally approached her with an invitation to go to Stacey's in-laws' house to take a nap, she accepted.

Coach Murray's activities at Mr. and Mrs. Simpson's house consisted of eating lunch and taking a nap. During lunch, Coach Murray and the six players present

had a conversation about a player from another team who had gotten injured and would be unable to participate in the upcoming national tournament. This prompted a discussion about the types of activities that would be unadvisable for the players to engage in before nationals. One player joked about whether they could skydive, and then other activities were mentioned. Stacey's daughter mentioned that her grandparents had various activities available on their property, including swimming, fishing, and riding a go-cart and a golf cart. Of those, Coach Murray indicated that players should avoid swimming or go-carting. After reminding the players that they should take some time to rest and relax before the evening session, Coach Murray went upstairs, where Mrs. Simpson showed her to a bedroom. Thereafter, Coach Murray slept until she was awakened to the news of B.G.'s accident.

Meanwhile, the girls sought Mr. Simpson's permission to use the golf cart, and he and Mrs. Simpson instructed the girls on how to operate it and where they could and could not take it. They specifically told the girls not to take the golf cart up a certain hill/driveway. They also stated that they preferred that their granddaughter be the driver, since she was an experienced golf cart driver. The adults outside supervising the golf cart activity were Mr. and Mrs. Simpson, Stacey, and Sally. At one point, Mrs. Simpson and Stacey stopped the girls who were on the cart because the Simpson granddaughter was not on the cart with them.

Shortly thereafter, Mr. Simpson was mowing at the top of the hill by the driveway and noticed that three girls were bringing the cart up the hilly driveway toward him. He stood in the driveway and blocked the cart from going any further. He was a "little mad" because they had disregarded his instruction not to come up that hill and because his granddaughter was not even on the cart with them. Appellant's App. at 228. Mrs. Simpson also observed the girls as they went up the hill and ran to try to stop them before they reached the highway. At that point, Mr. Simpson instructed the girls to turn around, take it back to the barn lot "and park it, you know, because—you know better than to come up this driveway." *Id.* Without switching drivers, the girls backed up and turned around to descend the hill. When they left his view, Mr. Simpson resumed his mowing. Seconds later, he heard a sound as the golf cart hit one of the cement parking blocks bordering the driveway. Mrs. Simpson also heard a "boom" and saw the cart jump over the concrete barrier and continue down the hill, taking a sudden sharp "90–degree turn." *Id.* at 191. At that moment, B.G., who was the right-side passenger, flew out of the cart, hit a swing set, and was injured. Thereafter, Coach Murray was awakened with the news of B.G.'s injury.

On June 3, 2008, the Griffins filed a personal injury action against Mr. and Mrs. Simpson, TIV, and three anonymous defendants. On July 28, 2009, the Griffins amended their complaint identifying the previously anonymous defendants as Coach Murray, Stacey Simpson, and Sally Nihill. On December 4, 2009, TIV and Coach Murray filed a motion for summary judgment alleging that, as a matter of law, Coach Murray owed no duty to B.G. during the time that the team was on break between tournament sessions. The trial court agreed and granted TIV and Coach Murray's motion on May 18, 2010. The Griffins now appeal. Additional facts will be provided as necessary.

### Discussion and Decision

The Griffins contend that the trial court erred in granting summary judgment in

favor of TIV and Coach Murray. Summary judgment is appropriate only where the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Wagner v. Yates*, 912 N.E.2d 805, 808 (Ind.2009). We review a summary judgment de novo, applying the same standard used in the trial court. *Fort Wayne Patrolmen's Benevolent Ass'n v. City of Fort Wayne*, 903 N.E.2d 493, 496 (Ind.Ct.App.2009), *trans. denied.* Thus, we construe all facts and reasonable inferences in favor of the non-moving party. *Dugan v. Mittal Steel USA Inc.*, 929 N.E.2d 184, 186 (Ind.2010). The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Motorists Mut. Ins. Co. v. Wroblewski*, 898 N.E.2d 1272, 1274 (Ind.Ct.App.2009), *trans. denied.* We may affirm based on any theory supported by the designated evidence. *Cincinnati Ins. Co. v. Davis*, 860 N.E.2d 915, 922 (Ind.Ct.App.2007).

### I. Coach Murray

■ The Griffins' claim against Coach Murray is essentially one for negligent supervision. To establish a claim for negligence, a plaintiff must demonstrate that (1) the defendant owed her a duty; (2) the defendant breached that duty; and (3) the plaintiff suffered a compensable injury proximately resulting from the defendant's breach of duty. *Sparks v. White*, 899 N.E.2d 21, 23 (Ind.Ct.App.2008). "Absent a duty, there can be no breach and, therefore, no recovery in negligence." *Bowman ex rel. Bowman v. McNary*, 853 N.E.2d 984, 990 (Ind.Ct.App.2006) (citation and quotation marks omitted). Generally, the

existence of a duty is a pure question of law appropriate for disposition by summary judgment. *Indiana Dep't of Transp. v. Howard*, 879 N.E.2d 1119, 1122 (Ind.Ct. App.2008). However, if factual questions are interwoven, the existence of a duty may be a mixed question of law and fact appropriate for determination by a jury. *Id.* Because negligence cases are often fact-sensitive and thus inappropriate for summary judgment, the party seeking summary judgment in a negligence case must demonstrate that the undisputed material facts negate at least one of the elements essential to the plaintiffs' claim. *McClyde v. Archdiocese of Indianapolis*, 752 N.E.2d 229, 232 (Ind.Ct.App.2001).

Here, the Griffins claim that Coach Murray had a duty to supervise B.G. while she rode Mr. and Mrs. Simpson's golf cart during the afternoon break at Mr. and Mrs. Simpson's home.[1] They base this argument on one of two theories: (1) in loco parentis; or (2) assumption of duty.

### A. In Loco Parentis

■ In loco parentis means " 'in the place of a parent.' " *Marriage of Snow v. England*, 862 N.E.2d 664, 666 (Ind.2007) (quoting BLACK'S LAW DICTIONARY 803 (8th ed.2004)).

> The doctrine refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to legal adoption. It embodies the two ideas of assuming the parental status and discharging the parental duties. This status results from intention and

---

1. The Griffins assert that Mr. and Mrs. Simpson's golf cart constituted an attractive nuisance/dangerous instrumentality. However, this assertion is irrelevant in this appeal because neither Coach Murray nor TIV controlled Mr. and Mrs. Simpson's property. *See*

*Sizemore v. Templeton Oil Co.*, 724 N.E.2d 647, 650 (Ind.Ct.App.2000) ("A duty of care may exist with respect to premises not belonging to the defendant if the defendant controls the property upon which an injury occurs").

generally may be terminated at any time.

Historically, in loco parentis has been deployed to protect schools and teachers from liability for restricting and disciplining their pupils. It has likewise served as a basis for the authority of juvenile courts.

*Id.* (citations and internal quotation marks omitted).

In the context of educating children, the in loco parentis doctrine is particularly important based on Indiana's compulsory education laws mandating the availability of public education for its citizens and the ensuing recognition that schools need to stand in the position of parents and guardians to the students regarding matters of student conduct and discipline. *Linke v. Nw. Sch. Corp.*, 763 N.E.2d 972, 979 (Ind. 2002). The in loco parentis doctrine has been applied in both public and private school settings. *See, e.g., Stratton v. State,* 791 N.E.2d 220, 224 (Ind.Ct.App.2003) (in loco parentis applied to social pastor whose duties included handling student disciplinary issues as dean of private school), *trans. denied.* Negligent supervision has been applied to persons entrusted with the care of children. *See, e.g., Davis v. LeCuyer,* 849 N.E.2d 750, 757 (Ind.Ct.App.2006) (summary judgment held inappropriate where host teenager's parents were entrusted with guest teenager's safety, did not instruct or supervise guest, and guest was injured on their jet ski), *trans. denied.*

In Indiana, we have not specifically addressed the application of the in loco parentis doctrine in the context of a private club sport, where the club is unaffiliated with a school. The Griffins assert that the doctrine should apply and cite as support the Louisiana case of *Turner v. Parish of*

*Jefferson Through Department of Recreation,* 721 So.2d 64 (La.App. 5 Cir.1998), *writ denied* (1999). In *Turner,* a twelve-year-old basketball player drowned at a hotel pool while away at a tournament with her Parish Recreation Department all-star team. The player's parents filed a wrongful death action against the hotel and against the Parish and its coaches on the basis of in loco parentis. There, the Louisiana Court of Appeals evaluated the various degrees of fault attributable to the player, the player's mother, the hotel, and the Parish and its coaches and concluded that

[a]cting in *loco parentis,* the coaches had a duty to monitor the children under their supervision with reasonable care under the circumstances, considering the age of the children and their immature judgment, and the conditions of the pool. We conclude that reasonable attention to those children, especially those without other family members to watch over them, would have enabled the coaches to be aware of [the player's] activities, her sudden absence from the group for more than seven minutes, and ascertained her whereabouts. Had she been properly monitored, as were the other children, it is reasonable to assume that she would have been noticed while in distress or found much earlier.

*Id.* at 75 (footnote omitted).[2]

We find the facts of *Turner* to be distinguishable. There, the team was not part of a private club, but was a municipal parks and recreation department team. Also, in *Turner,* the tournament was far enough away to require an overnight stay as a team. The hotel stay was preplanned, and its details were discussed

**2.** The *Turner* court assessed the Parish and its coaches' fault at ten percent of the overall fault, with sixty percent attributable to the hotel, fifteen percent attributable to the child's mother, and fifteen percent attributable to the child herself. 721 So.2d at 78.

with parents, most of whom accompanied the team. Here, the team did not have plans for the free time between sessions, and no one affiliated with the team could possibly have known how long their break time would last until the morning games were completed. After the morning session, Coach Murray released the players to their parents and told them what time they must return for the evening session.[3] Her undisputed statement was that she felt tired and ill due to her pregnancy, but that she had intended to stay at the tournament venue during the break to watch other games. It was not until Stacey and Sally approached her about the impromptu gathering at Stacey's in-laws' home that she decided to forgo her original plans and go to Mr. and Mrs. Simpson's house to take a nap. Not only were Stacey and Sally aware that her express purpose of accepting the invitation was to sleep, but Mr. and Mrs. Simpson were also aware of this and allowed her to use one of their bedrooms to take a nap.

Moreover, with respect to B.G., the undisputed facts indicate that it was Stacey, not Coach Murray, who specifically invited both B.G. and her father to come to the gathering at her in-laws' home. Instead of accepting, B.G.'s father gave permission for B.G. to attend, did what he described as a "basic parent to parent hand-off" of B.G. to Stacey, and returned to Indianapolis to watch another daughter's sporting event. Appellant's App. at 50–51. There is no evidence that B.G.'s father was even aware of whether Coach Murray would be attending the impromptu gathering at Mr. and Mrs. Simpson's house, let alone supervising the girls while there. As such, he could not have entrusted B.G. to Coach Murray's care during the six-hour break between tournament sessions. Likewise, as discussed more fully below, Coach Murray did not demonstrate any intent to assume parental status or undertake an affirmative duty *vis-à-vis* B.G. during the break between tournament sessions. Thus, we conclude, as a matter of law, that the in loco parentis doctrine does not apply to Coach Murray under the facts of this case.

### B. Assumption of Duty

The Griffins also argue that Coach Murray, by her conduct, voluntarily assumed a duty to supervise B.G.'s activities at Mr. and Mrs. Simpson's home. "Indiana recognizes the gratuitous assumption of duty by one who, through affirmative conduct or agreement, assumes and undertakes a duty to act." *Sizemore v. Templeton Oil Co.*, 724 N.E.2d 647, 651 (Ind.Ct.App.2000). "While the issue of whether a defendant has assumed a duty generally rests with the trier of fact, if no facts or reasonable inferences in the record create material issues of genuine fact, the question can be determined by law." *Holtz v. J.J.B. Hilliard W.L. Lyons, Inc.*, 185 F.3d 732, 744 (7th Cir.1999) (citations omitted). In addressing the gratuitous assumption of duty,

> Indiana courts adhere to Justice Cardozo's musing on th[e] subject: "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." In essence, then, a duty may be imposed upon one who by affirmative conduct ... assumes to act, even gratuitously, for another to exercise care and skill in what he has undertaken. The defendant must have specifically and deliberately undertaken the duty which he is charged

---

**3.** Six team members went to the Simpsons' impromptu gathering, and the rest presumably spent the break with their own parents. The record does not indicate whether the whole team was even invited to the Simpsons' gathering.

with having done negligently. In addition, it is also important that the party on whose behalf the duty is being undertaken relinquish control of the obligation; the party who adopts the duty must be acting *"in lieu of"* the original party.

*Id.* (citations and internal quotation marks omitted) (emphasis in original).

Thus, to have gratuitously assumed a duty, Coach Murray must have specifically and deliberately undertaken some action that demonstrated her intent to supervise B.G.'s golf cart activity. *Sizemore,* 724 N.E.2d at 652.[4] Essentially, the Griffins assert that Coach Murray gratuitously assumed a duty to supervise the players by giving them instructions regarding which activities were permissible at Mr. and Mrs. Simpson's house during their break time. The record indicates that Coach Murray occasionally gave the players rules that extended beyond the volleyball court. For example, she typically gave them arrival times for matches and instructed them to wear winter clothes during cold weather and to get adequate sleep before big matches. Specifically, the Griffins cite a lunchtime conversation at Mr. and Mrs. Simpson's house during which Coach Murray and the six players in attendance discussed the importance of staying well-rested and healthy for the upcoming national tournament. The conversation included general reference to the types of activities in which the girls should or should not participate before the upcoming national tournament. One player asked if skydiving would be okay, and then the girls discussed activities available on Mr. and Mrs. Simpson's property. Coach Murray referenced swimming and go-carting as activities to avoid and fishing and golf cart riding as generally acceptable activities. Appellant's App. at 333–35.

It is undisputed that after lunch Coach Murray went upstairs to take a nap. As stated, she accepted Stacey's invitation to Mr. and Mrs. Simpson's house specifically for the purpose of sleeping, and the four other adults present were aware of her intentions. Moreover, the undisputed evidence indicates that only part of the team was present at Mr. and Mrs. Simpson's and that Coach Murray was unaware of where the other team members had gone when she released the players to their parents after the morning session. She also stated that she was not involved in planning the impromptu gathering and did not know who had made the arrangements for the girls to come to Mr. and Mrs. Simpson's house. *Id.* at 279–81. Instead, Mr. and Mrs. Simpson, as the property owners, and Sharon and Sally, as the organizers, were respectively responsible to instruct and supervise the girls during their outdoor activities. As property owner, Mr. Simpson stated that he was "the boss of the cart" with the authority to tell the girls "to take it down and park it." *Id.* at 301. The Simpsons instructed the girls about the places that they could not take the golf cart; the girls disobeyed the instructions, and Mr. Simpson told them to put the cart away. It was en route to parking the cart that the accident occurred. Stacey and Sally planned the gathering and were the ones who extended the invitations to Coach Murray, the parents, and the girls. Coach Murray did not even know which girls and/or parents would be attending, and B.G.'s father did

---

4. We reject the Griffins' assertion that it is their *perception* that matters when assessing whether Coach Murray gratuitously assumed a duty to supervise B.G.'s golf cart usage. *See Van Duyn v. Cook–Teague P'ship,* 694 N.E.2d 779, 782 (Ind.Ct.App.1998) ("A defendant cannot be bound by a duty based upon a custom and practice that exists not in reality but only in the mind of the plaintiff"), *trans. denied* (1999).

not know that Coach Murray would be attending. Notably, Stacey stated in her deposition that she did not consider Coach Murray to have the same responsibility as the adults who were outside watching the girls during the golf cart activity while Coach Murray slept. *Id.* at 287.

In sum, the impromptu gathering was not a "team event," and Coach Murray was merely a guest whose attendance was due to a last-minute change of plans when she was presented with an invitation that included the opportunity to nap. As such, she no more deliberately and specifically assumed a duty to supervise B.G.'s golf-carting activity at Mr. and Mrs. Simpson's house than she would deliberately or specifically have assumed the obligation to dress a player in warm clothes during winter or put her to bed early on the night before a match. As a matter of law, Coach Murray did not have a duty to supervise B.G.'s golf cart activity.

## II. TIV

Finally, the Griffins assert that TIV is liable based on the theory of respondeat superior. The general rule is that vicarious liability will be imposed upon an employer under the doctrine of respondeat superior where the employee has inflicted harm while acting "within the scope of employment." *Gilbert v. Loogootee Realty, LLC,* 928 N.E.2d 625, 629 (Ind.Ct.App. 2010) (citation and quotation marks omitted), *trans. denied.* To fall within the scope of employment, TIV's liability would depend upon a determination that its employee, Coach Murray, committed a tort while acting, at least in part, to further TIV's interests. *Southport Little League v. Vaughan,* 734 N.E.2d 261, 268 (Ind.Ct. App.2000), *trans. denied* (2001). Because Coach Murray did not commit the tort of negligent supervision, as a matter of law, respondeat superior cannot apply against

TIV. Accordingly, we affirm the trial court's entry of summary judgment in favor of TIV and Coach Murray.

Affirmed.

NAJAM, J., and ROBB, C.J., concur.