**CAESARS RIVERBOAT CASINO, LLC, Appellant–Plaintiff–Counterclaim Defendant,**

v.

**Genevieve M. KEPHART, Appellee–Defendant–Counterclaimant.**

**No. 31A01–0711–CV–530.**

Court of Appeals of Indiana.

March 20, 2009.

Rehearing Denied May 26, 2009.

---

Gene F. Price, Steven P. Langdon, Frost Brown Todd, LLC, New Albany, IN, Attorneys for Appellant.

Terry Noffsinger, Noffsinger Law, P.C., Evansville, IN, Attorney for Appellee.

## OPINION

MATHIAS, Judge.

Caesar's Riverboat Casino, LLC ("Caesar's") filed suit in Harrison Circuit Court alleging that Genevieve M. Kephart ("Kephart") failed to provide funds to cover checks written while gambling at Caesar's establishment. Kephart countersued alleging that Caesar's took advantage of her pathological gambling condition to unjustly enrich itself. Caesar's filed a Trial Rule 12(B)(6) motion on Kephart's counterclaim. The trial court denied Caesar's motion and Caesar's appeals. Concluding that Indiana's common law does not provide Kephart a private cause of action in negligence against Caesar's in the form of a counterclaim, we reverse.

### Facts and Procedural History

On March 18, 2006, Kephart visited Caesar's after Caesar's offered her a free hotel room, drinks, and meals. While at the casino, Kephart gambled and lost $125,000 in a single evening through the use of six counter checks provided to her by Caesar's.

Subsequently, Kephart's checks were returned for insufficient funds. Caesar's filed suit against Kephart on January 23, 2007, for payment of the checks, treble damages, and attorney fees, all as provided by Indiana law.[1] On April 2, 2007, Kephart filed an answer and counterclaim in which she alleged that she is a pathological gambler and that Caesar's knew of her condition and took advantage of her condition to enrich itself. She seeks to recover damages for past, present, and future mental, emotional, and psychological damages; destroyed and/or strained relationships with family members and friends; doctor, hospital, pharmaceutical, or other medical expenses; loss of quality of life and enjoyment of life; and other expenses not yet known to her.

Caesar's moved to dismiss the counterclaim pursuant to Trial Rule 12(B)(6) and the trial court denied that motion. Caesar's filed a motion requesting that the trial court certify its order for interlocutory appeal.[2] The trial court granted that request and we subsequently accepted interlocutory jurisdiction.

### Standard of Review

A motion to dismiss under Trial Rule 12(B)(6) tests only the legal sufficiency of the complaint, not the facts supporting it. *Thompson v. Hays,* 867 N.E.2d 654, 656 (Ind.Ct.App.2007), *trans. denied.* The court may only look to the complaint and may not look to other evidence in the record. *Id.* A motion to dismiss should be granted only if "facts alleged in the complaint are incapable of supporting relief under any set of circumstances." *Godby v. Whitehead,* 837 N.E.2d 146, 149 (Ind.Ct. App.2005), *trans. denied.* We will review a trial court's ruling on a motion to dismiss de novo. *Thompson,* 867 N.E.2d at 656.

### Discussion and Decision

Indiana courts have not addressed the precise issue now before us, most likely because of existing state regulation of Indiana's gaming industry and the relatively short history of that industry. However, two cases from Indiana have addressed compulsive gamblers' claims against casinos for gambling losses. In

1. Ind.Code § 34–24–3–1 (1999).

2. We held oral argument on this matter on September 18, 2008, at Anderson University. We thank faculty, staff, and students for their hospitality and additionally commend counsel on the quality of their oral and written advocacy.

*Merrill v. Trump Ind., Inc.*, 320 F.3d 729 (7th Cir.2003), Merrill, a compulsive gambler, alleged that the riverboat casino failed to prevent him from gambling after he asked to be evicted from the casino if he entered. The *Merrill* court determined that in light of the state regulation of gambling in Indiana, the Indiana Supreme Court most likely would not conclude that the legislature intended to create a private cause of action. *Id.* at 732. The court found that the regulations would at most impose a duty upon the casino operator to the State through the Indiana Gaming Commission, not to the individual gambler. *Id.*

The *Merrill* court also addressed whether a common law duty of care existed, a question not yet answered by any Indiana court. The court determined that casinos would be held to the same standard of care as that of other businesses. *Id.* at 733. The court analogized Merrill's claimed duty to dram shop liability. However, it held that just as a patron who drinks, drives, and is *personally* injured cannot recover from the tavern that served him alcohol, a gambler cannot hold a casino liable for the gambler's *personal* damages incurred through his own gambling. *Id.* The court did not consider how one's status as an alcoholic bar patron or a compulsive gambler might affect the question of duty.

Next, *Stulajter v. Harrah's Indiana Corp.*, 808 N.E.2d 746 (Ind.Ct.App.2004), specifically addressed whether Stulajter could sue Harrah's for failing to prevent him from gambling at their casino, despite Stulajter's participation in the voluntary self-exclusion program administered by the Indiana Gaming Commission. Stulajter sought to sue Harrah's alleging that Harrah's violated regulations pertaining to the self-exclusion program when it did not prevent him from gambling at its casino. We

determined that the gaming statutes and regulations did not create a private cause of action against a casino operator to protect compulsive gamblers from themselves. *Id.* at 749. Our court also cited *Merrill* and adopted its holding.

However, neither of these cases is entirely dispositive in the present case. *Merrill* addressed the availability of common law negligence recovery against casinos and analogized the losing gambler to an injured, intoxicated bar patron but did not consider whether the result would be different in the case of a known alcoholic bar patron or a known compulsive gambler. *Stulajter* addressed the issue of whether Indiana's gaming laws and regulations allow a private cause of action for failure to comply with those gaming laws, specifically with the self-exclusion list. The case now before us requires that we examine whether an Indiana casino operator can owe a duty to a patron or potential patron who the casino knows to be a compulsive gambler as alleged in Kephart's counterclaim.

### I. Negligence Theory

Kephart argues that, because Caesar's knew her to be a compulsive gambler at all relevant times, the casino owes her a duty under common law to protect her from its enticements to gamble. Indiana common law requires that Kephart must establish three elements to recover on a theory of negligence: (1) a duty on the part of the defendant to conform its conduct to a standard of care arising from its relationship with the plaintiff, (2) a failure of the defendant to conform its conduct to the requisite standard of care required by the relationship, and (3) an injury to the plaintiff proximately caused by the breach. *Miller v. Griesel*, 261 Ind. 604, 611, 308 N.E.2d 701, 706 (1974).

"No better general statement can be made than that the courts will find

a duty where, in general, reasonable persons would recognize it and agree that it exists." *Gariup Construction Co. v. Foster*, 519 N.E.2d 1224, 1227 (Ind.1988) (quoting W. Prosser & J. Keeton, Prosser & Keeton on Torts § 53, at 359 (5th ed.1984)). To determine whether the law recognizes any obligation on the part of Caesar's to conform its conduct to a certain standard for the benefit of the plaintiff is a question of law. *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind.1991). To determine if a duty exists, we must look at (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns. *Id.* We will examine each component in turn.

### A. Relationship between the Parties

■ Kephart argues that the relationship between the parties is that of a business invitee and proprietor. To determine whether a relationship exists, we must look to the nature of the relationship, a party's knowledge, and the circumstances surrounding the relationship. *Downs v. Panhandle E. Pipeline Co.*, 694 N.E.2d 1198, 1203 (Ind.Ct.App.1998), *trans. denied.* "A duty of reasonable care is not owed to the world at large, but must arise out of a relationship between the parties." *Bowman ex rel. Bowman v. McNary*, 853 N.E.2d 984, 990 (Ind.Ct.App. 2006). Kephart has alleged that the relationship is based on her trip to gamble at Caesar's casino upon Caesar's invitation.

Kephart cites to *Burrell v. Meads*, 569 N.E.2d 637, 639 (Ind.1991), for the proposition that a business owner like Caesar's owes a duty to its business invitees to use reasonable care for their protection while they are on the landowner's premises. Then she refers to the *Burrell* court's adoption of the Restatement (Second) of Torts Section 343 (1965) to support her claim against Caesar's. However Section 343 subjects the landowner to liability for *physical* harm. Restatement (Second) of Torts § 343 (1965). In Kephart's counterclaim, she does not allege any direct physical harm from a condition or improvement upon Caesar's premises, but rather asserts that Caesar's caused her mental, emotional, and psychological distress. Therefore, we believe that Section 343 is distinguishable.

■ It is also instructive for us to look to other business owners who sell goods and services to the public in order to examine their duties to invitees. While it is clear that such owners owe patrons a duty to protect them from *physical* risks while on the premises, we have not discovered any case law from any state that imposes an additional duty such as that which Kephart seeks to impose on Caesar's. For example, department stores have no common law duty to refuse to sell goods and services to a known compulsive shopper. The fact that such a shopper may have borrowed the funds used or will become indebted to the store's own or a third-party credit card company for the purchase is not the department store's responsibility, even if the invitee's compulsiveness is known. We believe that Caesar's relationship to Kephart is much the same.

### B. Foreseeability

■ We will impose a duty only where a reasonably foreseeable victim is injured by a reasonably foreseeable harm. *Webb*, 575 N.E.2d at 997. "The duty of reasonable care is not, of course, owed to the world at large, but rather to those who might reasonably be foreseen as being subject to injury by the breach of the duty." *Thiele v. Faygo Beverage, Inc.*, 489 N.E.2d 562, 574 (Ind.Ct.App.1986). An inquiry into the existence of a duty and an inquiry into proximate cause are concerned

with exactly the same factors. Prosser & Keeton, *supra*, § 53. Both inquiries look to the consequences of the challenged conduct that should have been foreseen by the actor who engaged in it.

Since *Webb v. Jarvis* was handed down by the supreme court in 1991, the concept of foreseeability as to duty has developed into two lines of thought. The first has sought to apply a broad definition of duty foreseeability that considers the broad type of plaintiff and harm involved without regard to the facts of the actual occurrence. *See Goldsberry v. Grubbs*, 672 N.E.2d 475, 479 (Ind.Ct.App.1996), *trans. denied; see also Williams v. Cingular Wireless*, 809 N.E.2d 473 (Ind.Ct.App. 2004), *trans. denied.*

In *Goldsberry*, the plaintiff sued GTE, among others, alleging negligent placement of a telephone pole which was struck by a car in which she was a passenger. The trial court granted summary judgment for GTE, determining that a telephone company does not owe a duty to the motoring public to exercise reasonable care when placing telephone poles along Indiana highways. We sought to delineate between the inquiry into the existence of a duty and the inquiry into proximate cause, labeling the first a question of law and the second a question of fact. *Id.* We concluded that duty foreseeability must necessarily be a lesser inquiry than proximate cause foreseeability since a determination of duty foreseeability using the same standard would make a determination of proximate cause foreseeability unnecessary. *Id.* We also determined that the inquiries implicated both a question of law and a question of fact that would require different evaluations. *Id.* We reversed the trial court's decision granting GTE's motion for summary judgment, finding that GTE owed a duty of reasonable care in connec-

tion with its placement of a telephone pole near a roadway.

However, the majority of cases follows a second line of thought that more narrowly defines the inquiry and focuses on the particular facts of the situation to determine the foreseeability of duty. In *NIPSCO v. Sell*, 597 N.E.2d 329 (Ind.Ct.App. 1992), a motorist left the traveled portion of a road and struck a utility pole. Our court concluded that in some cases this would be a reasonably foreseeable situation, however, under the facts of *Sell*, such a situation was not reasonably foreseeable. *Id.* at 334. Our analysis focused on the particular facts of the particular situation, not on general concerns. *Id.* Other cases have followed the *Sell* court's analysis to determine foreseeability. *See e.g. State v. Cornelius*, 637 N.E.2d 195 (Ind.Ct.App. 1994); *Indiana Limestone Co. v. Staggs*, 672 N.E.2d 1377 (Ind.Ct.App.1996).

A more recent case in this line is *Hammock v. Red Gold, Inc.*, 784 N.E.2d 495 (Ind.Ct.App.2003), where our court considered whether the owner of a tomato processing plant could sue a motorist for negligence after the motorist struck an electric utility pole, ultimately causing a power failure that affected the plant. We determined that the plant was outside the "zone of danger" that immediately surrounded the accident, but that this alone did not indicate the existence of or the foreseeability of a duty. *Id.* at 502. We then looked to the types of harm that befall a business that has its power fail to determine whether the injury suffered by Red Gold was reasonably foreseeable. *Id.* at 502–03. We agreed with the rationale of Restatement (Second) of Torts § 281 (1965), Comment (e) that " '[w]hen harm of a kind normally to be expected as a consequence of the negligent driving results from the realization of any one of these hazards, it is within the scope of the

defendant's duty of protection.'" *Id.* at 503. We concluded that while it may be foreseeable that damage to an electric utility pole could cause a plant to shut down and that might cause damage to perishable food items, it is extremely unlikely that the damage suffered was the kind of harm which would normally be expected as the result of an automobile accident. *Id.* at 503.

Our supreme court has not directly addressed the issue of duty foreseeability but did address the issue indirectly in *Estate of Heck ex rel. Heck v. Stoffer*, 786 N.E.2d 265 (Ind.2003). In that case, the court looked to the specific facts to determine whether the harm was indeed foreseeable but specifically "decline[d] to take a narrow view of Webb's foreseeability of harm prong[.]" *Id.* at 269. The court determined that the parents of a fugitive from police owed a duty to an officer who was shot by the fugitive to exercise reasonable and ordinary care in the storage and safekeeping of the parents' handgun used in the crime and that a genuine issue of material fact existed as to whether the parents breached that duty. This would seem to be a position that encompasses both *Goldsberry* and *Sell*, as well, by looking not only to the facts of the particular case, but also examining the broad type of victim and harm involved.

Without more, *Heck*, *Sell* and *Goldsberry* might therefore support finding foreseeability of harm on the part of Caesar's. However, what was not addressed in these cases is the effect of "bilateral" foreseeability, or the foreknowledge of both the alleged tortfeasor and victim, of the possible harm that occurs. *Heck*, *Sell*, and *Goldsberry* did not have reason to consider bilateral foreseeability. None of the injured parties in *Heck*, *Sell*, or *Goldsberry* voluntarily placed themselves in the way of foreseeable harm, as Kephart did by choosing to travel to and gamble at Caesar's casino. For this reason, we believe that Kephart's situation is more akin to that of a participant injured during a sporting activity, than to that of a traditional negligence plaintiff.

The general rule in sports injury cases is that, "voluntary participants in sports activities ... cannot recover for injury unless it can be established that the other participant either intentionally caused injury or engaged in conduct so reckless as to be totally outside the range of ordinary activity involved in the sport." *Mark v. Moser*, 746 N.E.2d 410, 420 (Ind. Ct.App.2001). In *Mark*, we held that "it is a question of law for the determination of the court, whether the injury-causing event was an inherent or reasonably foreseeable part of the game[.]" *Id.* at 420.

*Bowman ex rel. Bowman v. McNary*, 853 N.E.2d 984 (Ind.Ct.App.2006) considered whether a student golfer could claim negligence when a teammate swung her club and accidentally hit the student golfer. In *Bowman*, our court concluded that while we do not follow *Mark's* reliance on primary assumption of risk, it is correct and consistent with *Webb* to evaluate, under an objective standard and as a question of law, " 'whether the injury-causing event was an inherent or reasonably foreseeable part of the game.'" *Bowman*, 853 N.E.2d at 988 (quoting *Mark*, 746 N.E.2d at 420).[3]

---

**3.** The *Bowman* court also held that, even in a sporting activity, liability might attach for injuries caused by the *reckless* conduct of a participant. *Bowman* determined that "recklessness requires that a participant in a sporting activity be (1) conscious of his or her misconduct; (2) motivated by indifference for the safety of a co-participant or co-participants; and (3) know that his or her conduct subjects a co-participant or co-participants to

This reasoning extends comfortably to the case before us. Beyond being foreseeable, it is common knowledge that more money is lost than is won by patrons at any casino. Common sense tells a reasonable person and all gamblers, compulsive or otherwise, that "the house usually wins." It is also foreseeable that marketing by the casino may lead an individual to gamble and lose at the casino.

"When a patron wagers at a casino, he is not simply 'giving' money to the casino, but instead he is spending his money— purchasing a chance to win even more." *Schrenger v. Caesars Ind.*, 825 N.E.2d 879, 884 (Ind.Ct.App.2005). While Kephart lost the money she wagered, it is an injury that she chose to risk incurring. She wagered her money to purchase a chance to win even more. Indeed, it is extremely unlikely that she would have brought suit had she won her wagers.

■■■ Accepting Kephart's allegations as true, as we must, Caesar's knew that Kephart was a compulsive gambler and marketed to her with that in mind. However, we conclude that even these allegations taken as true do not surmount Kephart's own foreknowledge of the risk of her injuries. *See Mark*, 746 N.E.2d at 420, *Bowman*, 853 N.E.2d at 995. We also conclude that a casino operator does not act in a reckless manner by marketing to individuals it knows to be compulsive gamblers.[4]

For gamblers, compulsive or otherwise, just as for shoppers, compulsive or otherwise, marketing by a vendor is not reckless conduct.

*C. Public Policy*

■■■■■■ "Duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of public policy which lead the law to say that the plaintiff is entitled to protection." *Webb*, 575 N.E.2d at 997. Factors that bear on this consideration include convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, and the moral blame attached to the wrongdoer. *Ousley v. Bd. of Comm'rs of Fulton County*, 734 N.E.2d 290, 294 (Ind.Ct.App.2000), *trans. denied.*

As to this public policy component, the most salient feature of the case before us is the General Assembly's decision to legalize and regulate certain types of gambling, including Kephart's activities. In so doing, the General Assembly established the Indiana Gaming Commission ("Commission"). Ind.Code § 4–33–3–1 (2002). Under Indiana Code section 4–33–4–1, the General Assembly gave the Commission the power and duty to administer and regulate gaming in Indiana with concomitant enforcement authority. Pursuant to this authority, the Commission promulgated detailed regulations regarding casinos and

---

a probability of injury." *Bowman*, 853 N.E.2d at 995. The *Bowman* court re-emphasized the general rule that "the defendant's conduct must be so reckless as to be totally outside the range of ordinary activity involved in the sport." *Id.* In this regard, we are troubled by the fact that Caesar's allowed Kephart to cash *six* counter checks in order to wager and lose the amount at issue. We are also sympathetic to the fact that Indiana Code section 34–24–3–1(1999) may authorize Caesar's to recover treble damages and attorney fees for the checks that were dishonored. However, we believe that regulation of this

questionable conduct is the responsibility of the Indiana Gaming Commission, under Indiana Code section 4–33–4–2(2002) and as explained *infra* in fn. 6.

4. We further note that any governmental restriction on the casino operator's marketing could also implicate the operator's right to commercial free speech as guaranteed by the First Amendment. However, Caesar's raised no First Amendment defense and we will therefore not address the free speech implications of a restriction on casino marketing.

their operations. The power to revoke, suspend, restrict or place conditions on gaming licenses rests with the Commission. Ind.Code § 4–33–4–8. The Commission may also impose fines and take other actions as necessary to ensure compliance with Indiana's gaming law. *Id.;* 68 I.A.C. 13–1–21(b).

In addition to having the power and duty to administer and regulate gaming in Indiana, the Commission is also ordered to adopt rules for the purpose of preventing practices that are detrimental to the public interest and "providing for the best interests of [ ] gambling." Ind.Code § 4–33–4–2(3). The Commission is further required to adopt rules for "imposing penalties for noncriminal violations of this article." Ind. Code § 4–33–4–2(5).

In the exercise of its authority, the Commission established and implemented a voluntary exclusion program. Ind.Code § 4–33–4–3(a)(9). The Commission also established a toll-free telephone number for the prevention and treatment of compulsive gambling be posted in each riverboat and on each admission ticket and uses a portion of gaming revenues to combat compulsive gambling. Ind.Code § 4–33–4–12.2; Ind.Code § 4–33–12–6. Casino marketing, directly or through complimentary items, is regulated by the Commission in Indiana Code section 4–33–4–3 and 68 Indiana Administrative Code 1–12–1 et seq. Indiana Code section 4–33–4–3 requires that the Commission promulgate rules that require casino operators to make all reasonable attempts, as determined by the Commission, to cease all direct marketing efforts to a person participating in the self-exclusion program. 68

Indiana Administrative Code 1–12 controls how the casinos may use complimentary chips or tokens for marketing purposes. One may argue that this statutory framework does not provide enough protection for compulsive gamblers, but that argument is more properly addressed to the Commission or to the General Assembly.[5]

### D. Balancing of Duty Factors

The relationship between Kephart and Caesar's is not remote. Under *Heck, Sell* and *Goldsberry,* the harm is quite foreseeable, indeed predictable. However, the bilateral foreseeability of the harm associated with gambling does not support the establishment of a common law duty on the part of Caesar's. The small opportunity to win and the substantial likelihood of losing is implicit in the act of gambling and is reasonably and equally foreseeable to the casino and to the gambler alike. *See Schrenger,* 825 N.E.2d at 884. Moreover, marketing by casino operators to compulsive gamblers is not reckless conduct.

Most importantly, public policy does not support the imposition of a unilateral duty on casinos to protect compulsive gamblers from the casinos' marketing activities and hosting. The General Assembly has made the public policy decision to legalize gambling and has set up a statutory and regulatory framework to govern how casinos do business in Indiana.

Even if we were to assume that, under the facts presented in Kephart's counterclaim, Caesar's does indeed owe a duty to compulsive gamblers beyond that which is owed to any other business invitee, Kep-

---

**5.** A review of regulations in states that currently allow gaming reveal that twelve have legislation or regulation providing for a self-exclusion list: Florida, Illinois, Indiana, Louisiana, Maine, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, and Pennsyl-

vania. Another eight states do not currently have a self-exclusion program for problem or compulsive gamblers: Colorado, Delaware, Iowa, New Mexico, Oklahoma, Rhode Island, South Dakota, and West Virginia.

hart's own behavior tips the balance of the duty factors. Despite knowledge of her proclivity towards compulsive gambling, Kephart took no action to cut off her ties with casinos. Additionally, Kephart only decided to seek treatment after losing a large amount of money that she could not pay back. While Caesar's actions in allowing her to write six checks totaling $125,000 are extremely concerning and should be examined by the Commission under Indiana Code section 4–33–4–2(3), Kephart has a responsibility to protect herself from her own proclivities and not rely on a casino to bear sole responsibility for her actions.

Kephart has argued that the Restatement (Second) of Torts section 343 applies to Caesar's under the facts pleaded in her counterclaim. Appellant's Br. p. 6. The Restatement section 343 provides, in pertinent part, that:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by exercise of reasonable care would discover the condition, and should realize that it involves an *unreasonable risk to invitees*, and
>
> (b) should expect that *they will not discover or realize the dangers, or will fail to protect themselves against it,* and
>
> (c) fail to exercise reasonable care to protect them against the danger.

Although we have held supra that section 343 is distinguishable because Kephart was not physically harmed by a condition on or improvement to real estate, implicit in section 343 is a responsibility on the part of invitees to take reasonable measures to discover or realize dangers and to protect themselves against those dangers. Kephart actually knew the dangers involved in gambling and could have easily protected herself against those dangers but apparently chose not to do so.

In this regard, Kephart could have, but failed to participate in the self-exclusion program established by the Commission, through which compulsive gamblers can voluntarily exclude themselves from casinos and casinos are called upon to make their best efforts to avoid marketing to them and to prevent them from entering and gambling at the casinos. *Stulajter* tells us that that solution, and likely no other solution, will be a perfect solution to gambling abuses. But in a heavily-regulated industry like gaming, the issues raised by Kephart's counterclaim are most properly directed to the Indiana Gaming Commission and to the General Assembly, where they can be considered as matters of public policy which are the sole and proper province of the legislative branch of government.[6]

The legalization and regulation of gaming is not that different in concept than the legalization and regulation of alcohol sales

---

6. In *Taveras v. Resorts Int'l. Hotel Inc.*, No. 07–4555, 2008 WL 4372791, *5, Slip op. (D.N.J. Sept. 19, 2008), the court determined that there was no common law duty that required the casinos to restrain compulsive gamblers. It recognized that the majority of authority does not support finding a common law duty. The *Taveras* court also determined that based on New Jersey's "extraordinary[,] pervasive and intensive" gaming regulations, it would appear that the State deliberately chose not to impose such a duty. *Id.* Also notable is the court's recognition that the State had expressly absolved casinos from liability for failing to exclude self-excluded persons from gambling. *Id.* In contrast, Indiana's regulatory framework already in place provides that casinos shall be subject to disciplinary action under 68 I.A.C. 13 for failing to comply with requirements related to the self-excluded persons, among others, by "knowingly refusing to withhold direct marketing, check cashing, and credit privileges." 68 I.A.C. 6–3–4(e)(2).

and consumption, which are regulated legally by the General Assembly and administratively by the Alcohol and Tobacco Commission. Indeed, this observation brings us back to a straightforward extension of the analogy first put forth by the Seventh Circuit more than five years ago in *Merrill.*

## Conclusion

■ For all of these reasons, the facts alleged in Kephart's counterclaim "are incapable of supporting relief under any set of circumstances." *Godby,* 837 N.E.2d at 149.[7] There is no common law duty obligating a casino operator to refrain from attempting to entice or contact gamblers that it knows or should know are compulsive gamblers. Caesar's motion to dismiss under Trial Rule 12(B)(6) therefore should have been granted by the trial court.

Reversed.

DARDEN, J., concurs.

CRONE, J., dissents with separate opinion.

CRONE, Judge, dissenting.

In this appeal, we consider as a matter of first impression for this Court whether a casino—a gambling enterprise that owes its existence to, is regulated by, and is a source of revenue for the State of Indiana—has a common law duty to refrain from enticing to its premises a known pathological gambler who has not requested that she be removed from the casino's direct marketing list or excluded from the casino. The majority concludes that no such duty exists. I respectfully disagree.

Kephart's counterclaim against Caesars sounds in negligence. "To make a successful negligence claim, a plaintiff must establish three elements: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) an injury proximately caused by the breach of that duty." *Clark v. Aris, Inc.,* 890 N.E.2d 760, 763 (Ind.Ct.App.2008), *trans. denied.* "Duties which may be the bases of negligence actions may arise by operation of the common law or by statute." *Dep't of Natural Res. v. Morgan,* 432 N.E.2d 59, 62 (Ind.Ct.App.1982), *trans. denied.*

Caesars' motion to dismiss is premised on its assertion that it owed no duty to Kephart. In *Stulajter,* 808 N.E.2d 746, the principal case on which Caesars relies, the plaintiff, "a self-described compulsive gambler with a gambling addiction[,]" alleged that the casino at which he lost approximately $70,000 "breached its statutory duty by sending him marketing materials and admitting him ... after he placed himself on [its] voluntary self-exclusion list." *Id.* at 747. The trial court granted Harrah's motion to dismiss, and Stulajter appealed.

Because the *Stulajter* court's analysis addresses concepts mentioned below, I quote from it at length:

Stulajter claims in his complaint that he has a private right of action against Harrah's for its alleged violation of a statutory duty to maintain and honor the self-exclusion list required by Indiana gaming regulations. Thus, the threshold question is whether Stulajter has a right to bring a private cause of action under these circumstances.

---

7. We agree with Judge Crone's dissent in that our observations in this opinion are limited to Kephart's counterclaim and are not intended to limit Kephart's right to assert affirmative defenses to Caesar's claim for payment of the counter checks, including incompetency, impaired capacity, breach of the covenant of good faith and fair dealing, duress, and unconscionability.

To determine whether an individual has the right to a private cause of action for the violation of a statute, a court must first look at legislative intent. We have consistently held that a private cause of action will not be found where the legislature has expressly provided for enforcement of the statute.

In this case, the statutes that Stulajter claims Harrah's violated involve the regulation of riverboat gambling and expressly delegate authority for enforcement of the statutory provisions to the Indiana Gaming Commission (Commission). The Indiana legislature created the Commission and empowered it to adopt rules for the regulation of the gaming industry. The Commission is charged with providing for the prevention of practices detrimental to the public interest and providing for the best interests of riverboat gambling. IC 4–33–4–2(3). IC 4–33–4–2(5) authorizes the Commission to impose penalties for noncriminal violations of this article. IC 4–33–4–3(a)(5) specifically includes the levy and collection of penalties for noncriminal violations of statute as one of the Commission's mandates. That statute also requires the Commission to create a voluntary exclusion program, in which a person may agree to refrain from entering any establishment under the Commission's jurisdiction. IC 4–33–4–3(c) sets out voluntary exclusion program requirements and provides ["][t]hat an owner of a facility under the jurisdiction of the commission shall make all reasonable attempts as determined by the commission to cease all direct marketing efforts to a person participating in the program.["] IC 4–33–4–3(c)(6) (emphasis added).[8]

Furthermore, the Commission has created rules and regulations for the gaming industry, which are included in Indiana Administrative Code Title 68. Article six specifically establishes rules for exclusion and eviction from a casino. *See* IND. ADMIN. CODE tit. 68, r.6–1–1 *et seq.* (2002); IND. ADMIN. CODE tit. 68, r.6–2 *et. seq.* The general provisions section states ["][e]ach riverboat licensee shall have in place criteria for evicting persons and placing persons on its eviction list ... the eviction criteria shall include the following behavior ... (5) A person requests that his or her own name be placed on the riverboat licensee's eviction list.["] 68 IAC 6–2–1.

Stulajter claims that the statutes give rise to a private cause of action in this case because the harm is to an individual and not the public at large. We disagree with Stulajter's assertion that a private individual has the right to bring a cause of action for the failure to comply with the self-exclusion list requirement because the harm is a private injury instead of a general public injury. *Appellant's Reply Brief* at 6. The duty to determine the requirements of and enforce the voluntary exclusion program rests with the Commission. IC 4–33–4–3(a)(5); IC 4–33–4–3(c). Therefore, proper enforcement of IC 4–33–4–3 is through the Commission and not a private cause of action. If the legislature intended to create a right to a private cause of action under the Commission rules for riverboat gambling, it could have included such a provision. Because it did not do so, we conclude that Stulajter does not have the right to bring a private cause of action based on a violation of the self-exclusion program rules. If Harrah's is in violation of any of the stated statutory provisions, it must answer to the Commission, not a private

---

8. This paragraph is now codified as Indiana Code Section 4–33–4–3(c)(5).

citizen claiming harm from the alleged violation.

Gaming is a regulated industry. The legislature created the Commission and gave it the power to enact comprehensive regulations governing the operation of gaming facilities in Indiana and the power to enforce the regulations and penalize noncompliance. The legislature has not enacted provisions that make a casino operator liable for failing to find and evict a patron on its self-exclusion list before that patron gambles money in its casino. Instead, the legislature expressly provided that the standard of reasonableness for adherence to provisions of a voluntary exclusion program was to be determined by the Commission. *See* IC 4–33–4–3. We conclude that Indiana's gaming statutes and regulations do not create a private cause of action to protect compulsive gamblers from themselves.

Our conclusion today comports with the court's opinion in *Merrill v. Trump Indiana, Inc.*, 320 F.3d 729, 732 (7th Cir.2003), in which a federal court applying Indiana law determined that a casino operator does not owe a duty to protect compulsive gamblers from themselves. The court noted that Indiana law does not recognize the existence of a duty between a tavern proprietor and its patrons and stated, ["]Indiana law does not protect a drunk driver from the effects of his own conduct, and we assume that the Indiana Supreme Court would take a similar approach with compulsive gamblers.["] *Id.*

*Id.* at 748–49 (bracketed quotation marks added) (some citations omitted).

In this appeal, Caesars asserts that

Kephart's claim here is even less persuasive than Stulajter's unsuccessful claim, because Kephart does not even allege that she placed herself on a voluntary exclusion list—in fact, it is clear from her Counterclaim that she never did. Even if she had made the request, she still would have no claim for failing to abide by its statutory obligations.

Appellant's Br. at 7 (citations omitted). Caesars fails to acknowledge, however, that Kephart's counterclaim is not based on an alleged breach of a statutory duty, but rather on an alleged breach of a common law duty.[9] The statutes regulating gambling do not specifically preclude the existence of a common law duty; in other words, the legislature has not specifically granted casinos immunity from common law tort claims.[10] Consequently, I do not find *Stulajter* persuasive, let alone controlling, as Caesars also urges. *See, e.g., Picadilly, Inc. v. Colvin*, 519 N.E.2d 1217, 1219 (Ind.1988) (disagreeing with tavern's assertion that "absent a violation of the statute prohibiting the furnishing of alcoholic beverages to intoxicated persons, there could be no independent common law liability for injuries caused by a customer's intoxication": "Rather than preempting the common law, [Indiana's dram shop] statutes designate certain minimal duties but do not thereby relieve persons from otherwise exercising reasonable care.").

Our supreme court has recognized that "[t]he strength and genius of the common law lies in its ability to adapt to the chang-

---

**9.** As such, it is tempting to find Caesars' argument waived.

**10.** If the legislature believes that casinos are free to exploit the most vulnerable among us for economic and tax gain, then they should explicitly indicate that is the public policy of our state. In the absence of such a declaration, I believe that the common law affords some minimum level of protection.

ing needs of the society it governs." *Brooks v. Robinson,* 259 Ind. 16, 22–23, 284 N.E.2d 794, 797 (1972). In determining whether a common law duty exists, courts must balance three factors: "(1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns." *Estate of Heck,* 786 N.E.2d at 268 (citing *Webb,* 575 N.E.2d at 996). "Whether the defendant must conform his conduct to a certain standard for the plaintiff's benefit is a question of law for the court to decide. Courts will generally find a duty where reasonable persons would recognize and agree that it exists." *Id.* (citation omitted).

Before considering the three so-called *Webb* factors for purposes of this case, it is important to note that in *Merrill,* 320 F.3d 729, cited approvingly in *Stulajter,* the Seventh Circuit Court of Appeals rejected a compulsive gambler's statutory tort claim against the defendant casino [11] and then considered his argument that the casino "owed him a duty of care under common law." *Id.* at 732. The court stated,

> We can find no Indiana case addressing the extent of the duty owed by casinos to their patrons.[12] Indeed, it appears that no court has addressed the specific

issue whether casinos can be sued in tort when they fail to evict a gambler who requests his own exclusion.

Courts elsewhere that have addressed the liability of casinos to injured plaintiffs have imposed on casinos no higher duty to their patrons than any on other business. Under Indiana law, a business owes its invitees a duty to take reasonable care for their safety. Merrill has never alleged in district court that [the casino] had not taken reasonable care for his safety or that he ever felt unsafe on the premises.

The closest analogy to Merrill's situation is that of a tavern's liability to exercise reasonable care to protect its patrons. In Indiana, a tavern proprietor serving alcohol can be held liable, under certain conditions, if an intoxicated patron injures another patron or a third party. But a patron who drives while intoxicated, causing his own injuries, cannot recover from the tavern that served him alcohol. Essentially, Merrill thinks that the casino should be held responsible for the destructive effects of his 1998 relapse into gambling. But Indiana law does not protect a drunk driver from the effects of his own con-

---

11. The gambler in *Merrill* wrote to the casino in 1996, "asking that he be evicted from it if he ever showed up to gamble." 320 F.3d at 731. In 1998, Merrill entered the casino and sustained "substantial gambling losses[,]" after which he sued the casino under several different theories. *Id.* at 730. The district court dismissed some claims and entered summary judgment against Merrill on his statutory and common law tort claims. On appeal, Merrill argued that "Indiana statutory provisions and administrative regulations impose[d] a duty on [the casino] to exclude gamblers who ask to be placed on the casino's eviction list." *Id.* at 732. The Seventh Circuit noted that in 1998, when Merrill gambled at the casino, "no statute or regulation explicitly obligated Indiana casinos to honor self-eviction requests." *Id.* The Commission did

not implement a regulation to this effect until 2000. *Id.* The court then determined that even if the regulation had been effective in 1998, "[g]iven the extent of gambling regulation in Indiana, ... the Indiana Supreme Court would not conclude that the legislature intended to create a private cause of action." *Id.*

12. The lack of Indiana cases on this topic is hardly surprising, given that riverboat casinos (and thus actions for collection of casino gambling debts) were not legalized until 1993. *Schrenger,* 825 N.E.2d at 882–84. As more and more states legalize gambling to raise revenue, one may anticipate that the common law in this area will continue to evolve.

duct, and we assume that the Indiana Supreme Court would take a similar approach with compulsive gamblers.

*Id.* at 733 (citations omitted). Given that the court did not undertake a full-fledged *Webb* duty analysis, I do not find *Merrill* persuasive here.

### A. Relationship Between the Parties

"In determining whether a relationship exists that would impose a duty, we must consider the nature of the relationship, a party's knowledge, and the circumstances surrounding the relationship. A duty of reasonable care is not owed to the world at large, but must arise out of a relationship between the parties." *Bowman,* 853 N.E.2d at 990 (citation and quotation marks omitted). The facts alleged in Kephart's counterclaim, which we must accept as true for purposes of this appeal, indicate that Caesars, knowing Kephart to be a pathological gambler, offered her "enticements to gamble, such as free hotel rooms, meals, limousine transportation, and alcohol[.]" Appellant's App. at 71. Kephart succumbed to Caesars' enticements and was admitted to the casino. Caesars then issued her six counter checks totaling $125,000 "without obtaining sufficient information to know whether [she had] sufficient funds to cover the amounts of the checks[.]" *Id.*

Contrary to Caesars' suggestion in its reply brief, its relationship with Kephart is not akin to that of a retail store and a consumer who "spen[t] too much money." Appellant's Reply Br. at 10. A more fitting analogy is that of a tavern that entices a known alcoholic with free food and then allows him to run up a substantial bar tab without regard for his ability to pay.[13] Caesars was aware of Kephart's gambling addiction, lured her into its casino with complimentary transportation, lodging, food, and drinks, let her gamble away $125,000 in borrowed funds without investigating her creditworthiness, and then sought to triple its take by suing her for treble damages plus attorney's fees.[14] I would conclude that the unsavory circumstances surrounding this relationship support the imposition of a duty in this case.

### B. Foreseeability of Harm

Our supreme court has stated that "[i]mposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonable foreseeable harm." *Webb,* 575 N.E.2d at 997. Here, Caesars enticed a known pathological gambler from two states away to its casino and issued $125,000 in counter checks to feed her gambling addiction without checking her credit. Given that "[c]asinos and other gambling enterprises do not go into business to lose money[,]" it is reasonably foreseeable—indeed, as the majority acknowledges, predictable—that Kephart would be injured by Caesars' actions. *Schrenger,* 825 N.E.2d at 883 n. 7. Consequently, I would conclude that this factor, too, supports the imposition of a common law duty of care.

### C. Public Policy

In *Williams v. Cingular Wireless,* 809 N.E.2d 473 (Ind.Ct.App.2004), *trans. denied,* this Court observed,

---

**13.** It is interesting to note that the Indiana General Assembly has criminalized the sale of alcoholic beverages to known "habitual drunkards." *See* Ind.Code §§ 7.1–5–10–14 (prohibiting such sales); 7.1–5–1–8 (setting criminal penalty as a class B misdemeanor).

**14.** It is estimated that "27 percent to 55 percent of all casino revenues come from just pathological gamblers[.]" John Warren Kindt, *"The Insiders" for Gambling Lawsuits: Are the Games "Fair" and Will Casinos and Gambling Facilities be Easy Targets for Blueprints for RICO and Other Causes of Action?,* 55 MERCER L.REV. 529, 545 (Winter 2004) (footnote omitted).

"Duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of public policy which lead the law to say that the plaintiff is entitled to protection." Various factors play into this policy consideration, including convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, and the moral blame attached to the wrongdoer.

*Id.* at 478 (quoting *Webb,* 575 N.E.2d at 997).

If Caesars knew that Kephart is addicted to gambling, as we must assume for purposes of this appeal, it would have been a relatively simple matter to exclude her from its direct marketing efforts and from the casino itself, as it is already required to do with those who participate in the voluntary exclusion program described in Indiana Code Section 4–35–4–2. It stands to reason that Caesars has a substantially greater capacity than Kephart to bear the loss at issue, and it also stands to reason that society would favor a policy preventing future injuries like those allegedly suffered by Kephart.

From a moral standpoint, Caesars' predation and prosecution of a pathological gambler is repugnant, although it is not the only blameworthy entity in this case:

Historically, the State of Indiana has prohibited gambling. In 1988, following voter approval, the Indiana Constitution was amended deleting the general prohibition against lotteries and authorizing lotteries conducted by the State Lottery Commission. At its next session, the legislature proceeded to authorize horse race gambling. Then, in 1993, a special session of the General Assembly approved riverboat casinos as a lawful gambling activity.

*Am. Legion Post No. 113 v. State,* 656 N.E.2d 1190, 1192 (Ind.Ct.App.1995) (citations omitted), *trans. denied* (1996). Riverboat casinos such as Caesars are taxed at either a flat rate of 22.5% of adjusted gross receipts from gambling games or graduated rates ranging from 15% of the first $25,000,000 of adjusted annual gross receipts to 40% of adjusted annual gross receipts exceeding $600,000,000. Ind.Code §§ 4–33–13–1, –1.5.[15] Casinos are required to remit these taxes to the Department of State Revenue "before the close of the business day following the day the wagers are made." *Id.* Given the apparent size and steadiness of the revenue stream generated by riverboat casinos, it seems clear that both the casinos and the State of Indiana share a common interest in gamblers—pathological or otherwise—losing as much money as quickly as possible.[16] One wonders if Indiana's legislators—and, more importantly, their constituents—have any qualms about balancing the State's budget on the backs of gamblers, especially those who are least able to resist and/or afford gambling.[17] I would conclude that

**15.** The graduated tax rates apply to casinos that operate under a "flexible scheduling plan," pursuant to which they may "conduct gambling operations for up to twenty-four (24) hours per day." Ind.Code § 4–33–6–21. The record does not indicate whether Caesars operates under a flexible scheduling plan.

**16.** Indiana Code Section 4–33–4–3(a)(1)(A) provides that the Commission shall adopt rules that it "determines necessary to protect or enhance ... [t]he credibility and integrity of gambling operations authorized by this article." Given that people are more likely to gamble if they believe that a game is conducted honestly, one may conclude that the legislature's emphasis on "credibility and integrity" is not purely altruistic but instead is directed toward maximizing profits for the casinos and thus tax revenues for the State.

**17.** One also wonders if Indiana's gaming regulations—and the Commission, which is responsible for enacting and enforcing them—

public policy favors imposing a common law duty on Caesars in this case.[18]

## D. Balancing of Duty Factors

In my view, all three factors militate in favor of imposing a duty on Caesars to refrain from enticing to its casino known pathological gamblers who have not requested that they be removed from the casino's direct marketing list or excluded from the casino. To hold otherwise would be to conclude that there is no level below which a casino (and thus the State of Indiana) may not go in enticing patrons and encouraging their reckless behavior.[19] I believe that Hoosiers would expect more from their government and the businesses that operate here. Therefore, I would hold that Caesars does have such a duty and that the trial court properly denied its motion to dismiss Kephart's counterclaim. Having reached this conclusion, I believe that three additional considerations are worth mentioning.

First, to the extent Caesars argues that Kephart may not recover "economic losses alone, without any claim of personal injury or damage to other property" in a tort action, Appellant's Reply Br. at 9 (citation and quotation marks omitted), I note that Kephart has in fact alleged non-economic injuries, including emotional distress.[20]

Second, as for Caesars' argument that "[a]llowing Kephart's claim to go forward would have the perverse result of encouraging compulsive gamblers *not* to participate in the voluntary exclusion program[,]" Appellant's Reply Br. at 11, I emphasize that a casino would owe a duty only to pathological gamblers of whom the casino has knowledge, not to other members of the public at large.

Third, I note that the viability of Kephart's counterclaim will not affect the viability of her affirmative defenses to Caesars' claim for payment of the counter checks, including incompetency, impaired capacity due to intoxication, breach of the covenant of good faith and fair dealing, duress, and unconscionability.

offer sufficient disincentives to deter the insidious conduct allegedly performed by Caesars in this case.

**18.** In arguing to the contrary, Caesars makes much of the fact that casinos are a heavily regulated industry. These regulations are designed primarily to ensure an accurate accounting of a casino's gambling revenues and thus to protect the State's financial interests, as opposed to the interests of individual gamblers.

**19.** The majority asserts that "Kephart has a responsibility to protect herself from her own proclivities and not rely on a casino to bear sole responsibility for her actions." Slip op. at 15. I believe that Kephart's ability to protect herself should be considered only in determining comparative fault, not in determining whether Caesars owes a duty to Kephart in the first instance. *See City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1244 (Ind.2003) ("Under comparative fault, the trier of fact can allocate fault to multiple contributing factors based on their relative factual causation, relative culpability, or some combination of both.").

**20.** To the extent Caesars suggests that it did not breach any duty of care or proximately cause Kephart's alleged damages, I observe that these issues were not the bases for its motion to dismiss and may be litigated on summary judgment or at trial.