



FILED

Dec 29 2025, 9:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

The Trustees of Indiana University,

*Appellants-Defendants*

v.

Chris Bradberry, et al.,

*Appellees-Plaintiffs*

---

December 29, 2025

Court of Appeals Case No.
25A-CT-284

Interlocutory Appeal from the Monroe Circuit Court

The Honorable Geoffrey J. Bradley, Judge

Trial Court Cause No.
53C01-2210-CT-2075

---

**Opinion by Judge DeBoer**
Judges Bradford and Weissmann concur.

**DeBoer, Judge.**

## Case Summary

[1]    Chris Bradberry, an offensive lineman for Indiana University's (IU) football team, suffered severe injuries during a strength training session after he was struck in the face by a resistance band. He and his parents sued IU, alleging the football program's strength and conditioning (S&C) coaches were at fault for his injuries. IU moved for summary judgment, arguing, among other things, that it had no liability under our Supreme Court's ruling in *Pfenning v. Lineman* that when "a participant in a sports activity" is sued for negligence, "if the conduct of such participant is within the range of ordinary behavior of participants in the sport, the conduct is reasonable as a matter of law and does not constitute a breach of duty." 974 N.E.2d 392, 404 (Ind. 2011). The trial court denied the motion for summary judgment after finding no "active participation by the coaching staff at the time of the injury" and thus concluding the S&C coaches were not "participants" under *Pfenning*. Appellant's Appendix Vol. 2 at 22.

[2]    In this interlocutory appeal, IU challenges the denial of its motion for summary judgment. Because the S&C coaches were sports participants under *Pfenning*, they instructed Bradberry to perform an exercise that was within the range of ordinary behavior involved in football S&C, and the Bradberrys failed to designate any evidence creating a genuine issue of fact that the S&C coaches

intentionally or recklessly caused Bradberry's injuries, we reverse and remand with instructions for the trial court to grant IU's motion for summary judgment.

## Facts and Procedural History

[3] Football "is a violent, high force contact sport." Appellant's App. Vol. 3 at 202. College football players must train their strength, speed, mobility, and stability to improve athletic performance and mitigate the risk of injury that is inherent in the sport. IU football, like most collegiate and professional football programs, employs specialized football S&C coaches who are responsible for designing and implementing exercise programs to accomplish these goals.

[4] When Bradberry played for IU, the S&C staff was comprised of highly qualified and experienced professionals. Among them was Aaron Wellman, the head S&C coach. Coach Wellman had been a student athlete himself, playing defensive back for Manchester University's football team. He went on to earn multiple advanced degrees, including a Ph.D. in sports science. Before becoming the head S&C coach for IU football, he spent four years as the New York Giants' S&C coach, and before that worked for several major college football programs.

[5] Beneath Coach Wellman was Jordan Hicks, the associate S&C director. Coach Hicks earned a bachelor's degree in kinesiology and played professional football for three years, which included stints with the Oakland Raiders and Tampa Bay Buccaneers. When he joined the IU S&C staff, he had more than a decade of experience as a college football S&C coach.

[6] On the day he was injured, Bradberry attended a voluntary pre-season workout at the IU football weightroom. One of the exercises the S&C coaches planned for Bradberry and his fellow offensive linemen to perform was resistance band face pulls. That exercise is generally performed by pulling resistance bands that have been secured to a fixed post toward the face. *See infra Figure 1.*



*Figure 1:* Appellant's App. Vol. 4 at 41.

[7] The S&C coaches instructed the players to use the post of a Woodway machine to hold the resistance bands in place. *See infra Figure 2.* It is undisputed that

Woodway machines are not designed for this purpose.[1]  Even so, IU's S&C coaches determined that the Woodway machine's vertical post could be used to secure resistance bands because all that is generally required to perform banded face pulls is "anything that's essentially an upright pole[.]"  Appellant's App. Vol. 2 at 224.



*Figure 2:* Appellant's App. Vol. 4 at 39.

---

[1] Woodway machines allow the user to run on a treadmill while wearing a belt attached to a post for added resistance.

[8] Before having athletes perform the exercise, the S&C coaches rested two looped bands on top of the post's clip and instructed players to adjust it to match their height. Since many football players like Bradberry were taller than the six-foot post, they were further instructed to perform the exercise in a split-stance lunge position to keep the bands parallel to the ground. Coach Hicks, who is six feet, four inches tall, personally tested the Woodway configuration[2] and IU's football players—Bradberry included—had performed "thousands and thousands of reps" of the exercise without incident. Appellant's App. Vol. 2 at 226.

[9] But as Bradberry performed face pulls on the day of his injury, the bands slipped over the top of the post and struck him in his left eye. He suffered significant life-altering injuries, including irreversible damage to his left retina. He is legally blind in that eye, which began to involuntarily drift after the incident, and he suffers from regular eye strain-induced headaches. He has already undergone three surgeries because of his injuries and may have to have additional corrective surgeries in the future.

[10] Bradberry and his parents sued the Trustees of IU, alleging that the Woodway configuration was "totally outside the range of ordinary activity involved in playing the sport of football." *Id.* at 30. Bradberry's causes of action included

---

[2] In its Appellant's Brief, IU used the phrase "Woodway configuration" to refer to the way the S&C coaches looped resistance bands around the Woodway post for use in face pulls. Given the usefulness of this phrase as a shorthand, we do the same in this opinion.

negligence and reckless and intentional misconduct, and his parents asserted a claim for loss of services.

[11] IU moved for summary judgment and argued, in pertinent part, that it was not liable for Bradberry's injury as a matter of law because it was "the exact type of freak sporting accident that does not create negligence liability" under *Pfenning*. *Id.* at 40. In opposition to that motion, the Bradberrys argued their claims survived *Pfenning*'s sports negligence analysis because the S&C "coaches intentionally designed, planned, and executed a strength training exercise that was reckless, consciously indifferent to player safety, and totally outside the range of ordinary activity in football." Appellant's App. Vol. 3 at 163. To support this argument, they designated the affidavit and report of an expert in the fields of physical therapy and athletic training, who concluded that "[h]aving the resistance bands looped over an open post and not tied off or anchored[] was reckless in nature[] and was likely to lead to a facial injury to a player." Appellant's App. Vol. 4 at 47.

[12] At a hearing on the motion for summary judgment, the Bradberrys' attorney pondered whether the *Pfenning* analysis applied at all because "the coaches [were] not . . . participants in this sporting event[.]" Transcript at 31. IU's counsel countered that the S&C coaches *were* sports participants because football players like Bradberry "are not lifting to stay in shape[,] they are lifting to play division one football and that is why you have very specialized coaches that are a [] part of that[.]" *Id.* at 39. At the conclusion of the hearing, the trial

court took the matter under advisement and asked the parties for proposed findings of fact and conclusions of law.

[13] Ultimately, the trial court denied IU's motion for summary judgment. It reasoned that while "[c]oaches can be considered participants in sporting events[,]" IU's S&C coaches were not actively participating in the exercise that injured Bradberry since "no coach was spotting [him] or directly instructing him." Appellant's App. Vol. 2 at 22. On IU's motion, the court certified its order for interlocutory appeal, and we accepted jurisdiction.

## Discussion and Decision

[14] We review a decision to grant or deny summary judgment de novo and apply the same standard as the trial court. *Isgrig v. Trs. of Ind. Univ.*, 256 N.E.3d 1238, 1244 (Ind. 2025). Pursuant to Indiana Trial Rule 56(C), the initial burden is on the moving party to make a "prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." *Id.* (quoting *Reed v. Reid*, 980 N.E.2d 277, 285 (Ind. 2012)). If the moving party satisfies this initial burden, "the burden then shifts to the non-moving party to come forward with evidence establishing the existence of a genuine issue of material fact." *Id.* Our review is limited "to the materials designated at the trial level." *Gunderson v. State, Ind. Dep't of Nat. Res.*, 90 N.E.3d 1171, 1175 (Ind. 2018), *cert. denied*. We construe any doubts as to the facts or reasonable inferences in favor of the non-moving party, and while the trial court's findings

and conclusions "aid our review, [] they do not bind us." *Sandoval v. Willow Lake Ests. Home Owners Ass'n, Inc.*, 255 N.E.3d 1181, 1186 (Ind. Ct. App. 2025).

[15] Indiana has adopted a sports negligence framework that is intended to promote "participation in athletic activities and [] discourage[] [] excessive litigation of claims by persons who suffer injuries from participants' conduct." *Pfenning*, 947 N.E.2d at 403. Because "[s]ound policy reasons support 'affording enhanced protection against liability to co-participants in sports events[,]'" the framework accounts for the strenuousness and imprecision of athletic activity that "may somewhat increase the normal risks attendant to the activities of ordinary life[.]" *Id.* (quoting *Bowman v. McNary*, 853 N.E.2d 984, 992 (Ind. Ct. App. 2006), *disapproved on other grounds by Pfenning*, 947 N.E.2d 392, *cited favorably by Megenity v. Dunn*, 68 N.E.3d 1080, 1085 (Ind. 2017)).

[16] As in any other negligence action, a party claiming to have been injured by a sport participant's negligence must prove the participant "(1) owed [him] a duty, (2) breached that duty, and (3) proximately caused [his] injury." *Megenity*, 68 N.E.3d at 1083. Though breach is ordinarily a question of fact, "a sports participant breaches no duty as a matter of law by engaging in conduct 'ordinary . . . in the sport[].'" *Id.* (quoting *Pfenning*, 947 N.E.2d at 404). Even so, a participant "may breach a duty by injuring someone intentionally or

recklessly[,]"[3] and summary judgment is inappropriate when there is a question of fact as to whether the participant has done so. *Id.*

[17] Here, as an initial matter, the parties agree that Bradberry was engaged in sports activity when he was injured, though they dispute exactly *what* sport he was engaged in. IU contends "[t]he relevant sport must be weight training" because the S&C coaches had "no on-field role with the football team[.]" Appellant's Brief at 24. In contrast, according to the Bradberrys, "Bradberry was a football player, not a body builder[,]" so the exercise he was performing should be analyzed as "part of IU's football program[.]" Appellees' Br. at 35-36.

[18] To the extent there are distinctions between weight training generally and strength training performed as part of an organized football program, they are immaterial under the present circumstances. Our Supreme Court has adopted a "broad, sport-centric focus" that *does not* parse the specifics of sports-related injuries but rather analyzes whether a given occurrence "is ordinary in the sport overall." *Megenity*, 68 N.E.3d at 1084. Here, Bradberry was performing face pulls as part of an S&C program designed by IU football's coaching staff. There is no dispute that S&C is not only *ordinary* in organized football but is an essential part of the sport. Thus, it is sufficient for our purposes to say that

---

[3] In this way, our Supreme Court has blurred the distinction between intentional, reckless, and negligent conduct that causes sports injuries. Pre-*Pfenning* cases attempted to differentiate such conduct. *See Bowman*, 853 N.E.2d at 995 (suggesting that recklessness is "a 'third category of fault' in between intentional and negligent misconduct") (quoting Dan B. Dobbs, *The Law of Torts* § 27 (2001)). Under *Pfenning*, however, "intentional or reckless infliction of injury may be found to be a breach of [the] duty" owed by sports participants in the negligence context. 947 N.E.2d at 404.

Bradberry was engaged in organized football, an integral part of which was resistance training as a component of a broader S&C program.

[19] With this background, we now address the parties' three main points of contention: (1) whether IU's S&C coaches were sports participants under *Pfenning*; (2) if so, whether their conduct in designing, implementing, and supervising the face pull exercise that injured Bradberry was ordinary in football S&C; and (3) whether there is any evidence the S&C coaches intentionally or recklessly caused Bradberry's injury.

## 1. Sports Participation Under *Pfenning*

[20] The Bradberrys contend that IU's S&C coaches were not sports participants, so *Pfenning*'s sports negligence framework is inapplicable to their claims. IU not only disagrees with that argument but contends the Bradberrys waived it by raising it for the first time at the summary judgment hearing. IU's waiver argument relies on the fact that the two opinions from this Court most directly on point found that the injured party waived any argument that a coach cannot be considered a participant under *Pfenning*. *See In re C.G.*, 157 N.E.3d 543, 547 (Ind. Ct. App. 2020) (injured party waived argument that coaches "are non-participants" because they raised it for the first time on appeal); *Tippecanoe Sch. Corp. v. Reynolds*, 187 N.E.3d 213, 217 n.3 (Ind. Ct. App. 2022) (injured party waived argument that coach was not a participant because "at the hearings on summary judgment, [she] agreed with the trial court . . . that a coach *is* a participant for the purposes of the *Pfenning* rule") (emphasis in original).

However, the waiver doctrine is premised on the notion that "a trial court cannot be found to have erred as to an issue or argument that it never had an opportunity to consider." *Washington v. State*, 808 N.E.2d 617, 625 (Ind. 2004). Moreover, "[w]aiver may be avoided if the newly-raised issue was inherent in the resolution of the case, the other party had unequivocal notice of the issue below and had an opportunity to litigate it, or if the trial court actually addressed the issue in the absence of argument by the parties." *Grathwohl v. Garrity*, 871 N.E.2d 297, 302 (Ind. Ct. App. 2007). Here, the Bradberrys raised the issue at the summary judgment hearing, IU responded in kind by presenting a counterargument, and the trial court ruled on the issue after considering the parties' arguments and soliciting their proposed findings of fact and conclusions of law. Thus, the Bradberrys did not waive the issue of whether IU's S&C coaches were sports participants. In any event, this Court's application of *Pfenning* and *Megenity*, together with the policy goals identified by our Supreme Court in promulgating Indiana's sports negligence rules, lead to the conclusion that IU's S&C coaches were sports participants whose conduct must be examined under *Pfenning*.

We begin our review of this issue with *C.G.*, where a high school basketball player sued her local school corporation after the coach aggressively blocked another athlete's shot during practice, causing the ball to strike C.G. in the temple. 157 N.E.3d at 544-45. C.G. appealed the trial court's grant of summary judgment to the school corporation, arguing the coach was not a sports participant under *Pfenning*. *Id.* at 547. Though the panel found that C.G.

had waived that argument, it nonetheless addressed it. *Id.* at 548. In doing so, it favorably cited the broad, pre-*Pfenning* definition of "participant" set forth by this Court in *Geiersbach v. Frieje*, which encompassed "all participants in [a] sporting event[,]" including "any person who is part of the [] event or practice involved" such as "players, coaches, and players who are sitting on the bench during play." 807 N.E.2d 114, 120 (Ind. Ct. App. 2004), *reh'g denied, trans denied*, *disapproved on other grounds by Pfenning*, 947 N.E.2d at 404 n.3.

[23]  The *C.G.* panel reasoned that "[a]lthough the Supreme Court in *Pfenning* disagreed with the 'no-duty approach' used in *Geiersbach*,[4] [it] *did not* disagree with or comment on the definition of 'participant' set out in" that opinion. *C.G.*, 157 N.E.3d at 548 (emphasis added). Indeed, though *Pfenning* rejected *Geiersbach's* reasoning that sports participants do not owe a duty of care to one another to prevent ordinary sports injuries, it "agree[d] with the Court of Appeals in permitting liability [only] when an athlete intentionally causes injury or engages in reckless conduct." *Pfenning*, 947 N.E.2d at 404 n.3. If the Court intended to overturn *Geiersbach*'s holding that coaches are sports participants, it could have explicitly done as much. Instead, it favorably cited *Geiersbach*, among other Court of Appeals opinions, in adopting the rule that "a

---

[4] In *Geiersbach*, this Court held:

> [A] participant does not owe a duty to fellow participants to refrain from conduct which is inherent and foreseeable in the play of the game[,] . . . [so] [t]hose participating in the event or practice should be precluded from recovering for injuries [caused by such conduct] unless they prove that the conduct was reckless or the injury was intentional.

807 N.E.2d at 118, 120.

participant's . . . intentional or reckless infliction of injury" may give rise to liability, without paring down the broad meaning of "participant" previously defined by this Court. *Id.* at 404.

[24] Despite the broad definition of "participant" embraced by the *C.G.* panel, the Bradberrys attempt to distinguish *C.G.* by noting that the coach there was "actively participating in the layup drill that led to the injury." Appellees' Br. at 26-27. In contrast, the Bradberrys contend "[t]he same cannot be said for any IU coach" because, at the time of the incident, "Coach Hicks was nearby but was not observing the face pull or providing any instruction[,] . . . Coach Wellman was on the other side of the weight room[,] . . . [and] [n]either coach directly involved themselves with the physical activity that was part of the injury." *Id.* at 27. This echoes the trial court's conclusion that *Pfenning* requires *active* participation in a sporting event or practice, which apparently means *direct* involvement in the physical activity that caused the claimant's injury.

[25] But neither *Pfenning* nor any case applying it has held that a participant must have been *directly* involved in the physical activity that caused an injury before invoking Indiana's sports negligence framework. On the contrary, the *Reynolds* panel held that "an analysis of a coach's individual actions related to supervising her athletes and the choices made therein are subsumed by a review of whether that coach was intentional or reckless in her conduct." 187 N.E.3d at 220. Reynolds was a flyer on her high school cheerleading squad who was "lifted or thrown into the air during cheerleading routines." *Id.* at 215. During a warm-up routine before a basketball game, Reynolds' coach instructed her

and other cheerleaders to "conduct the warm-up without protective mats . . . or additional spotters for the flyers." *Id.* After falling onto the gymnasium's bare hardwood floor, which broke her jaw and most of her teeth, Reynolds sued the school district under several negligence theories, including that her coach had failed to adequately supervise her. *Id.* at 215-16. To support her claims, she provided explanations from two other cheerleading coaches who opined that they would have conducted the warm-up differently and that Reynolds' coach had "made coaching errors regarding technique, the use of additional safety mechanisms, and the extent to which she supervised Reynolds[.]" *Id.* at 216. On appeal, the panel reasoned that because "the routine [the coach] had the cheerleading squad perform was ordinary under a general analysis of the sport, [it could not] separate out a coach's specific conduct related to supervision of the routine as a separate cause of action" under *Pfenning*. *Id.* at 220. Accordingly, it held that "a claim for negligent supervision cannot be considered a separate cause of action capable of eluding an analysis under the *Pfenning* rule." *Id.*

[26] In the present case, the Bradberrys effectively ask us to reach a conclusion different than *Reynolds* and hold that the decisions made by IU's S&C coaches in designing, implementing, and supervising the face pull exercise were outside the ambit of *Pfenning* because "the plan to use the resistance bands looped over the top of the Woodway post involved planning by the IU coaches well in advance of the day of the incident." Appellees' Br. at 28. According to the Bradberrys, "[h]ad Coach Hicks stepped in and 'called an audible' to do the

exercise a different way" on the day of the workout, he might have been a participant subject to the *Pfenning* rule. *Id.* The Bradberrys' formulation would hold that to be a participant in the workout, the coaches were required to have made an "immediate decision that was related to [] Bradberry's injury." *Id.*

[27] To read an "immediacy" requirement into *Pfenning*, as the Bradberrys ask us to do, would undermine the policy goals behind Indiana's sports negligence framework. A coach participating in a sporting event or practice should not be held liable (absent intentional or reckless conduct) for ordinary coaching decisions, nor should they "fear that judges will later armchair-quarterback their every movement." *Megenity*, 68 N.E.3d at 1084. This principle applies not only to "game-time decision[s,]" as the Bradberrys contend, but also to decisions made by coaches in planning and supervising practices, workouts, drills, or exercises that are ordinary in their sport. Appellees' Br. at 27. Under *Pfenning*, a coach who pre-plans and supervises a strength training session is as much a "participant" in the activity as is a coach who blocks a player's shot during a layup drill (as in *C.G.*) or instructs cheerleaders to perform a warm-up routine (as in *Reynolds*).

[28] As such, the trial court erred in concluding that IU's S&C coaches were not participants in the strength training session at which Bradberry was injured. The coaches planned the exercises Bradberry's position group was performing and instructed the players before the workout as to how they should perform each movement. Moreover, while it is true that the coaches were not "spotting" Bradberry in the sense that they were not hovering over him to

intervene in a moment's notice should he need assistance with a lift, they were nonetheless supervising the training session to ensure that players performed exercises correctly and in accordance with their individualized workout plans. To hold under these facts that the S&C coaches running the workout were not "participating" would narrow the definition of "participant" in contravention of *Pfenning*'s stated policy goals.

[29] For all these reasons, IU's S&C coaches were sports participants whose conduct must be analyzed under *Pfenning*.

## 2. Ordinary Conduct

[30] The parties further disagree as to whether the face pull exercise the S&C coaches had Bradberry perform was ordinary in a football S&C program. Critically, however, the Bradberrys do not contend that face pulls are in and of themselves foreign to football, but rather that the Woodway configuration was not the proper way to perform the exercise. *See* Appellees' Br. at 36 ("While strength training exercises are an integral part of a football program, setting up exercises that do not comply with guidelines and have a high likelihood of injuring a player are completely foreign to the sport."). The Bradberrys' argument on this point does not comport with the Court's holding in *Megenity*

that ordinary conduct "turns on the sport generally[,]" not the activity specifically.[5]  68 N.E.3d at 1083.

[31]  There, Megenity was holding a kicking bag that karate students were using to practice flying kicks. *Id.* at 1082.  One of the students improperly performed the kick and instead of keeping one foot on the ground as instructed, executed a jump kick with both feet in the air. *Id.*  He hit the bag with such force that Megenity fell to floor and injured her knee. *Id.*  After Megenity sued, the student moved for summary judgment under *Pfenning* on the basis that kicks are ordinary to karate generally. *Id.*  In opposition to that motion, Megenity contended that the student's kick was not ordinary because "a jump kick is never done within the specific drill being performed." *Id.* (internal quotation marks omitted).  The trial court disagreed with Megenity and granted summary judgment in favor of the student. *Id.*  After a divided panel of this Court reversed, the Supreme Court granted transfer and affirmed the trial court, reasoning:

> [W]hen Hoosiers play sports—performing activities ordinary in that context—they should not fear that judges will later armchair-quarterback their every movement.  After all, judges are more likely to have *general* sports knowledge than *specific* sports expertise.  . . . We need not, and should not, parse nuances of the

---

[5] Indeed, the Bradberrys conflate the issue of whether face pulls are ordinary in football generally with whether the S&C coaches acted intentionally or recklessly in designing, implementing, and supervising the specific exercise performed here.  These are two separate inquiries. *See Megenity*, 68 N.E.3d at 1085 (explaining that even when a sport participant's conduct was ordinary to the sport, the injured party "can survive a motion for summary judgment by presenting evidence of 'intentional or reckless infliction of injury.'" (quoting *Pfenning*, 947 N.E.2d at 404)).

exact angle of entry of a soccer player's slide tackle, the exact timing of a football player's late hit—or the sensei's exact instructions for a karate student's kick—to determine whether they were "ordinary" sports conduct.

*Id.* at 1084 (emphasis in original).

[32] Nonetheless, the Bradberrys ask us to parse nuances of the decisions made by IU's S&C coaches, who had decades of combined playing and coaching experience. They contend the Woodway configuration "failed to conform to applicable guidelines[,]" Appellees' Br. at 33, and in support of that contention cite the opinion of their designated expert who concluded that the S&C coaches improperly set up the face pull exercise:

> [The] [a]ppropriate set up for a face pull exercise . . . included solidly affixing the resistance [bands] to a point above the head. [] [A]ffixing the resistance [bands] on a base shorter than the person doing the exercise and asking them to pull up towards the face creates a dangerous situation.

Appellant's App. Vol. 4 at 47. The Bradberrys further argue that the Woodway configuration was not ordinary because safer options were available to perform the exercise:

> Alternative safer methods of performing a face pall [sic] were available to the IU coaching staff, including using a weighted cable/pulley exercise equipment, tying the resistance bands around a post without an open top, such as a weight rack post, [or] using the Woodway machine with the latch position at the top and the resistance bands tied around the post under the latch.

*Id.*

[33] However, even taking as true for the purposes of summary judgment that the way the S&C coaches had Bradberry perform face pulls was not technically correct or the safest available option, that *does not* create a genuine issue of fact as to whether the face pull exercise is generally ordinary in the sport. *See Megenity*, 68 N.E.3d at 1084 (concluding that the student's "jump kick was ordinary, *even if it was contrary to protocol*") (emphasis added); *see also Reynolds*, 187 N.E.3d at 219 (concluding that although the cheerleading coach's actions associated with coaching and supervision may have been inappropriate, "nothing suggest[ed] that th[e] routine was outside the ordinary conduct observed in the sport of cheerleading as a whole"). In other words, the Bradberrys' request for us to second guess the S&C coaches' decisions in designing, implementing, and supervising the face pull exercise is the kind of judicial armchair-quarterbacking the *Pfenning* sports negligence framework was designed to avoid.

[34] Of course, notwithstanding the fact that the S&C coaches engaged in otherwise ordinary conduct, the Bradberrys may "survive a motion for summary judgment by presenting evidence of 'intentional or reckless infliction of injury.'" *Megenity*, 68 N.E.3d at 1085 (quoting *Pfenning*, 947 N.E.2d at 404). The Bradberrys have presented no argument that the S&C coaches intended to injure Bradberry, so we limit our analysis to whether there is any evidence in the record that they did so recklessly.

## 3. Recklessness

A party claiming reckless infliction of a sports injury must prove three elements: (1) the sports participant who caused the injury intentionally acted or intentionally failed to act; (2) in doing so, they were consciously indifferent to the injured party's safety; and (3) their "particular conduct—including state of mind—[fell] 'totally outside the range of ordinary activity involved in the sport.'" *Id.* at 1085 (quoting *Welch v. Young*, 950 N.E.2d 1283, 1290 (Ind. Ct. App. 2011)). Our Supreme Court's opinions provide little clarity as to what constitutes recklessness in this context. *Pfenning* simply said that a golfer's failure to yell "fore" after hitting an errant shot could not "support a claim of liability based on recklessness[,]" but the Court based that conclusion on "the same reasons . . . that whether and how a golfer yells 'fore' in a particular situation cannot be a basis for a claim of negligence[.]" 947 N.E.2d at 405. *Megenity* set forth the three-element standard for proving recklessness, but in applying it merely held that Megenity failed to designate evidence that the student who performed the errant jump kick "*consciously disregarded* his classmate's safety." 68 N.E.3d at 1086 (emphasis in original).

Opinions by this Court applying the *Pfenning/Megenity* framework have had even less to say on the issue. In both *C.G.* and *Reynolds*, for example, the injured party did not contend that the coach acted recklessly, so the panels did not expand upon *Megenity's* recklessness standard. *See C.G.*, 157 N.E.3d at 548 ("C.G. makes no argument that [the coach] struck her recklessly."); *Reynolds*, 187 N.E.3d at 220 ("[T]here is no claim that [the coach] was intentional or

reckless in her conduct[.]"). In a third case, *Burdick v. Romano*, the panel affirmed the trial court's refusal to instruct the jury on ordinary negligence because it "would have confused the jury about [the injured party's] burden of proof, that is, to show that [the defendant sports participant] acted reckless[ly]." 148 N.E.3d 335, 344 (Ind. Ct. App. 2020), *trans. denied*. But *Burdick* said nothing about what it means for a sports participant to act recklessly.

[37] However, some guidance can be found in opinions from this Court pre-dating *Pfenning*. In *Bowman*, the panel held that

> recklessness requires that a participant in a sporting activity be (1) conscious of his or her misconduct; (2) motivated by indifference for the safety of a co-participant or co-participants; and (3) know that his or her conduct subjects a co-participant or co-participants to a probability of injury. A mistake in judgment is not sufficient to support a finding of recklessness. Rather, there must be a conscious indifference to the consequences of one's actions.

853 N.E.2d at 995. Put differently by another panel, a sports participant

> will be considered to have acted in reckless disregard of the safety of another [participant] if "he does an act, or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable person to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."

*Mark v. Moser*, 746 N.E.2d 410, 422 (Ind. Ct. App. 2001) (quoting Restatement (Second) of Torts § 500 (Am. Law Inst. 1965)), *disapproved on other grounds by*

*Pfenning*, 947 N.E.2d 392, *cited favorably by Megenity*, 68 N.E.3d at 1085.

Examples of "particularly egregious conduct" that might satisfy the

*Mark/Bowman* recklessness standard include:

> Biting an opponent's ear during a boxing match[;] . . . a baseball
> player flinging his bat toward a dugout in anger and striking
> another player[;] . . . head-butting an opposing player during a
> soccer match[;] . . . [and] flinging a [golf] club in anger or
> swinging wildly in frustration after hitting a poor shot and hitting
> another player with the club, albeit unintentionally.

*Bowman*, 853 N.E.2d at 996.

[38] Applying this standard to the present facts, the Bradberrys' expert presented evidence that the Woodway configuration was "reckless" in the sense that it was "likely to lead to a facial injury to a player." Appellant's App. Vol. 4 at 47. But to prove recklessness in the sports negligence context, a mere *likelihood* of injury is not enough. *See Mark*, 746 N.E.2d at 422 (recklessness requires an unreasonable risk of injury "substantially greater than that which is necessary to make [] conduct negligent." (quoting Restatement (Second) of Torts § 500)). Moreover, nothing in the designated evidence demonstrates that the S&C coaches were aware of an inherent danger associated with the Woodway configuration. Coach Wellman testified that throughout his lengthy career as a player and coach, he had never "experienced a band that came off the equipment and injured a player[.]" Appellant's App. Vol. 2 at 135. Similarly, Coach Hicks testified that he had performed face pulls when he played football, had his athletes perform the exercise during his time as a coach, and that none

of his previous experiences had given him reason to believe that the bands could slide off the top of the post and injure a player. He further testified that he personally tested the Woodway configuration and had witnessed players performing thousands of repetitions using the Woodway machine without injury.

[39] Critically, *none* of the designated evidence supports the conclusion that the S&C coaches were motivated by an indifference to player safety. *See Megenity*, 68 N.E.3d at 1086 (affirming summary judgment when evidence of conscious disregard was "absent"). On the contrary, the coaches testified that they previously had the players perform face pulls with the resistance bands wrapped around a weight rack. But the sharp edges of the rack were causing the bands to fray, which made Coach Wellman "afraid the band[s] would break" and injure a player. Appellant's App. Vol. 2 at 113. The coaches therefore transitioned to using the Woodway post, which had rounded edges that did not damage the resistance bands. So even if the Bradberrys are correct that the Woodway configuration was technically unsafe, it is undisputed that the coaches' decision to use the Woodway post was motivated by a concern for player safety, not a conscious disregard for it.

[40] Viewed in the light most favorable to the Bradberrys, the designated evidence shows that IU's S&C coaches failed to realize that the Woodway configuration presented a risk that the resistance bands might slip off the top of the post and injure a player. Under the ordinary negligence standard, this might have been enough to survive summary judgment. But proving recklessness requires a

showing that a participant's conduct be "pursued with knowledge and indifference that an injury . . . is probable." *Bowman*, 853 N.E.2d at 995 (quoting *Sidle v. Majors*, 341 N.E.2d 763, 775 (Ind. 1976), *reh'g denied*, *abrogated on other grounds by Collins v. Day*, 644 N.E.2d 72, 75 (Ind. 1994)). Here, there is no evidence in the record that IU's well qualified, highly experienced S&C coaches were consciously indifferent to a substantial risk of injury when they had Bradberry perform face pulls using the Woodway configuration. Accordingly, Bradberry's claim that the coaches recklessly injured him fails as a matter of law under *Pfenning* and *Megenity*, and IU is entitled to summary judgment on that claim.[6]

## Conclusion

[41] For these reasons, we reverse and remand with instructions for the trial court to grant IU's motion for summary judgment.

[42] Reversed and remanded.

Bradford, J., and Weissmann, J., concur.

---

[6] Because Bradberry's claim fails as a matter of law, IU is also entitled to summary judgment on his parents' loss of services claim. *See Lockett v. Planned Parenthood of Ind., Inc.*, 42 N.E.3d 119, 131 n.14 (Ind. Ct. App. 2015) (a parent's claim for loss of services "is extinguished if the child does not recover; in this sense, the parent's claim is derivative of the child's"), *reh'g denied*, *trans. denied*.

ATTORNEYS FOR APPELLANTS

Jonathan D. Mattingly
Hamish S. Cohen
Jeffrey N. Furminger
Jennifer W. Adams
Mattingly Burke Cohen and Biederman LLP
Indianapolis, Indiana


ATTORNEY FOR APPELLEES

Christopher G. Stevenson
Ball Eggleston PC
Lafayette, Indiana